SILAS BENT, RECEIVER OF THE ST. LOUIS MUTUAL LIFE INSURANCE COMPANY, Respondent, *v.* JOHN G. PRIEST, Appellant.

June 28, 1881.

1. One who acts as attorney for a corporation does not thereby bring himself into such a relation of personal trust and confidence with a director

thereof as to make it improper for him to afterwards act as counsel in a proceeding against such director for money which the corporation has lost through a breach of his official trust.

2. An agreement by which the attorney of a receiver was to receive a percentage of the sum recovered, and was to indemnify the receiver for costs, cannot be shown for the purpose of defeating an action brought by the receiver, under authority granted by the court to bring such suit if indemnified for the costs.

3. A director of a corporation is a trustee of the corporation, and is chargeable with all profits secretly made out of the trust relation.

4. A director who proposes and votes for a contract out of which he secretly makes a profit, may be compelled to pay over to the corporation any profits thus made, irrespective of whether the contract was beneficial to the corporation.

5. In such a case the Statute of Limitations begins to run when the corporation discovers the secret consideration for the director's vote.

APPEAL from St. Louis Circuit Court, ADAMS, J.
*Affirmed.*

A. J. P. GARESCHÉ and JOHN M. HOLMES, for the appellant : In cases of constructive trust, .or, when a person claiming in his own right is, by operation of law, turned into a trustee, courts of equity always have applied the Statute of Limitations. — *Smith* v. *Riccords*, 52 Mo. 581 ; s. c. 56 Mo. 553 ; *Murray* v. *Coster*, 20 Johns. 576 ; *Hawley* v. *Cramer*, 4 Cow. 717 ; *Kane* v. *Bloodgood*, 7 Johns. 114. " The next error is the exclusion by the court of evidence that the case was begun by Mr. Glover, and now prosecuted under a champertous contract. Because prosecuted under the bond, with surety of Mr. Glover to hold the receiver harmless for all costs in the event of defeat, and to receive if successful twenty-five per cent of the amount to be recovered." — *Kinealy* v. *Macklin, post,* p. 583 ; *Duke* v. *Harper*, 66 Mo. 61. The evidence does not show a cause of action. The facts do not show that this is a case in which a trustee having possession of the trust-fund has used the same for his personal benefit, and has reaped a profit from such use. Nor is it a case in which the trustee has received a profit by virtue of his position as trustee and has failed to account for it.

THOS. T. GANTT and JOHN M. GLOVER, for the respondent : "If a trustee accepts any benefits in conducting the business of his *cestui que trust*, he will hold them in trust for him," and "the directors of a corporation are trustees and agents of the corporation." — Perry on Tr., sects. 206, 207; Lewin on Tr. 318; *Gaskell* v. *Chambers*, 26 Beav. 360.

THOMPSON, J., delivered the opinion of the court.

This action is prosecuted by the plaintiff, as receiver of the St. Louis Mutual Life Insurance Company, against the defendant to recover certain securities alleged to have been paid to the defendant to induce him, as director of said company, to consent to a proposed transfer of the assets of the company, to the Mound City Life Insurance Company. Before examining the merits of the case it is necessary to dispose of two extrinsic matters which are presented at its threshold : —

1. It is assigned for error that the court overruled a motion made by the defendant to exclude one of the plaintiff's counsel from participating in the conduct of the cause. The ground of the motion was, that the counsel in question had been counsel for the St. Louis Mutual Life Insurance Company in defending a suit which had been brought against it by the superintendent of insurance of the State of Missouri at the time of the alleged breach of trust by the defendant. The counsel concerned and his associate have, both in their printed and in their oral arguments, expressly declined to notice this assignment. We cannot see that the conduct in question was of a character to prejudice the legal rights of the defendant, nor can we see that it involved any professional impropriety whatever. We took occasion, all of us, to express this opinion from the bench during the argument, and after more deliberate consideration, we see no reason to modify it in any respect. The defendant's motion involved the fallacy of identifying a

corporation with one of its directors. A corporation is one person, in the eye of the law, and its directors are other persons. In the eye of a court of law, the former is a principal, and the latter are its agents, or servants. In the eye of a court of equity, the former is a *cestui que trust*, and the latter are its trustees. One who acts as counsel for the aggregate body about a matter touching its interests does not thereby bring himself into such a relation of personal trust and confidence with one of its directors as to make it improper for him afterwards to act as counsel in a proceeding against such director for money which the corporation has lost through a breach of his official trust.

2. It is assigned for error that the court overruled a motion to dismiss the proceeding because instituted under a champertous contract between the receiver and his counsel, and that the court refused to hear evidence to prove the existence of such a contract. The answer alleges and the replication denies, that this suit was instituted and is being prosecuted under a champertous contract or bargain between the nominal plaintiff therein and his counsel, whereby the costs and expenses of the suit are to be borne by the latter, and the proceeds which may arise therefrom are to be divided between the said attorneys and the said nominal plaintiff. If this allegation had been made out, there are precedents which would have required the Circuit Court to dismiss the proceedings. Our Supreme Court has recognized the common-law rule as to champerty as existing in this State. *Duke* v. *Harper*, 66 Mo. 51. Two or three other courts have held or recognized the doctrine that, whenever it is made to appear in a court of justice that a suit is being prosecuted in pursuance of a champertous contract between the plaintiff and his counsel, by which the latter undertake to prosecute it at their own risk and costs, on consideration of receiving a part of the money or thing recovered, it is the duty of the court not to permit itself to become the organ and instrument of consummat-

ing such an agreement, but it must dismiss the suit. *Webb* v. *Armstrong*, 5 Humph. 379 ; *Hunt* v. *Lyle*, 8 Yerg. 142 ; *Barker* v. *Barker*, 14 Wis. 131 ; *Allard* v. *Lamirande*, 29 Wis. 502, 506 ; *Greenman* v. *Cohee*, 61 Ind. 201, 206. If the question were properly presented in this case, we should feel bound, notwithstanding those decisions, to adhere to the rule laid down by this court in *Lackland* v. *Smith*, 7 Mo. App. 593, reaffirmed by us in the recent case of *Million* v. *Ohnsorg*, ante, p. 432, and held by the Supreme Court of Iowa in the recent case of *Small* v. *Railroad Company*, 12 Cent. L. J. 575 ; and to hold that the contract under which the plaintiff's attorneys are prosecuting the suit is a matter which does not concern the defendant at all, and which cannot be set up by him to prevent an examination of the merits of the controversy. But as the question is presented, we cannot see that the Circuit Court has committed any error in the premises. The record sufficiently discloses that on February 12, 1879, Mary L. Sheather, a policy-holder of the St. Louis Mutual Life Insurance Company, by John M. Glover, her attorney, who is one of the counsel of the plaintiff in this suit, filed a petition in the Circuit Court in a suit there pending between the superintendent of insurance of Missouri as plaintiff, and this company as defendant, stating that a large amount of assets of the company had been unlawfully divided among different persons who were solvent, and asking that the receivers of the company (there were then three receivers) should appear and show cause why they should not institute suits for the recovery of such assets. This petition was referred to the receivers with instructions to investigate and report to the court whether it was for the interest of the policy-holders and creditors to institute the proceedings suggested. There are statements in the record that the plaintiff (made sole receiver) made a report in pursuance of this order, and that, upon this report, the court directed or gave him leave to sue, provided he was

indemnified against the costs and expenses of the litigation. The plaintiff, having testified as a witness, was asked on cross-examination, substantially the following questions: Whether John M. Glover one of his attorneys in this case, did not personally agree to pay and guarantee the expenses of this suit, and file a bond for that purpose, and to indemnify the plaintiff against such costs and expenses ; and whether his counsel did not also agree to prosecute this suit as counsel for the plaintiff for the contingent fee of twenty-five per cent of the amount which might be recovered? These questions were, under the objection of the plaintiff, ruled out, and the defendant excepted. The receiver testified that he brought this suit in pursuance of the order of the court already spoken of, and that he had no other authority for bringing it. But neither this order nor the report of the receiver on which it is based is embodied in the bill of exceptions. Neither is the bond of indemnity which Mr. Glover is supposed to have given the plaintiff, found in the record. But it appears that the defendant served the plaintiff with a notice to produce it, and that he did not do so, and this would have let in secondary evidence of its contents if, in the state of the inquiry, the defendant might rightfully demand the production of the bond itself.

How, then, does the question stand upon this record? At the request of a policy-holder of an insurance company a receiver is authorized, by the court which appointed him, to institute a certain suit, provided he is indemnified against costs. He brings the suit in the court which made the order, and whose officer he is. The defendant offers to show that a bond of indemnity is given by an attorney for this policy-holder, and that this attorney is also employed by the plaintiff to prosecute the suit for a contingent fee, and the court refuses to allow him to do so. We cannot see anything in this refusal that can be held error. As the report of the receiver and the order which the court made thereon, are not before us, we must presume that the court

acted in the exercise of a sound discretion in allowing him to prosecute the suit. Nor can we see any ground on which the action of the court can be impugned in providing that he should be indemnified against costs and expenses. Where the record does not speak, we must resort to all reasonable presumptions in support of the action of the Circuit Court. For aught that appears, there may have been no funds in the hands of the receiver to pay costs, and it may have been done with a view of protecting him from personal liability for the costs in the event of being cast in the suit. Nor does the fact that the bond. of indemnity may have been given by Mr. Glover, and not by Mrs. Sheather, his client, cut any figure in the case. *Non constat* but that his client may have been, by reason of insolvency, non-residence, or coverture, incapable of giving the required bond, in which case we see nothing which savors of champerty, or even of unprofessional conduct, in the act of her attorney in furnishing such a bond. It is the frequent practice of resident attorneys to furnish bonds in proceedings brought by non-resident clients. It is also the constant practice of public administrators, and other persons acting in a like representative capacity, to exact bonds of indemnity from persons beneficially interested in the trusts which they administer, before undertaking the responsibility of prosecuting suits to protect the interests of such persons. The receiver of an insolvent corporation is a trustee for its creditors; and if they, or any of them, require him to undertake expensive lawsuits, as such trustee, for their benefit, he may exact indemnity of them against costs and expenses; and if they, or any of them, furnish such a bond, not by themselves in person, but through their resident counsel, and all this is done under the eye of a court of justice, and in pursuance of its orders, it cannot be rightfully said that the law against champerty and maintenance has been contravened, especially when the grounds on which the court acted in making such orders are not made to appear.

3. Upon the merits, the record discloses the following facts : In the fall of 1873, the St. Louis Mutual Life Insurance Company was "out of line," and proceedings had been instituted by the superintendent of insurance of the State to wind it up. The directors, or a majority of them, were of opinion that the only way by which the company could be brought out of its difficulties was to effect a reinsurance of its risks. To accomplish this, a committee called "The Advisory Committee" was appointed, of which the defendant was a member. After unsuccessful efforts among the Eastern companies, negotiations were opened with the Mound City Life Insurance Company of St. Louis. Mr. Peck, who was a large stockholder in the St. Louis Mutual Life Insurance Company, but not a director therein, proposed to Mr. Lomax, who was secretary of the Mound City Life Insurance Company, to induce the directors of the St. Louis Mutual Company to insure in the Mound City Company, if the latter would pay him a brokerage fee of $175,000. Negotiations were had between him and the officers of the Mound City Company concerning this proposition, which resulted in the following contract : —

"This agreement, made and entered into this 27th of November, 1873, by and between the Mound City Life Insurance Company, party of the first part, and Charles H. Peck, party of second part, witnesseth : That whereas, the party of the first part is desirous of effecting the reinsurance of the St. Louis Mutual Life Insurance Company, and the services of the said Charles H. Peck are deemed necessary to accomplish said object; now, for the consideration hereinafter mentioned, the said Peck hereby agrees to devote his services for the procurement of such reinsurance and effecting a contract between said companies ; the said party of the first part agrees to pay said party of the second part the sum of $155,000 within sixty days from the fifteenth day of December, 1873, as full compensation for the ser-

vices and work of said party of the second part as aforesaid.

[Signed] "A. M. BRITTON, President.
" CHAS. H. PECK.

"Attest: S. W. LOMAX, Secretary."

Having made this contract, Mr. Peck approached Mr. Priest, who, as already stated, was a director in the St. Louis Mutual Company and a member of the partnership firm of Priest & Wyman, and told him that he (Peck) was greatly interested in having the reinsurance of the risks of the St. Louis Company by the Mound City Company effected ; that it was worth to the stockholders $15,000 to have this brought about; that what he proposed was a matter of business — a matter legitimately within the business of the partnership firm of which Priest was a member. He made. two or three visits to the office of Priest & Wyman and sounded Priest upon this matter, on the last of which Priest referred him, or, as Peck expressed it, "turned him over," to his partner, Wyman ; and he and Wyman " got right down to business in mighty short order," as Peck forcibly says in his testimony. The result of this conference was that Peck agreed to give Wyman $15,000 in the event of the proposed reinsurance being effected. Wyman, unwilling to take Peck's word, required him to put up security for the keeping of his promise, and he accordingly placed in the hands of Napoleon B. Mulliken a sealed package containing bonds of the Leavenworth, Atchison and Northwestern Railroad Company of the par value of $15,000, and lodged with him also a memorandum in writing directing him to deliver the bonds to Wyman when the proposed reinsurance should be. effected. Thereafter the proposed contract of reinsurance was entered into, the principal features of which were that the Mound City Company agreed to increase its capital stock by the sum of $500,000, and to reinsure the risks of the St. Louis Mutual Company in consideration of receiv-

ing all its assets. The meetings of the board of directors of the St. Louis Mutual Company in which this measure was considered, were conducted in public, newspaper reporters being present. There were twenty directors of the company, seventeen of whom voted for the proposed measure, two against it, and one was absent. The two who voted against it explained their votes on the record. One of them did so because he thought the proposed measure was insufficient for the protection of policy-holders ; the other thought it was not necessary to enable the St. Louis Mutual Company to pull through its difficulties. The measure received the approval of Gen. Frank P. Blair, the superintendent of insurance, and, upon his application, it was approved by the Circuit Court of St. Louis County, and the proceeding instituted by his predecessor against the St. Louis Mutual Company was dismissed. In his application to the court for the approval of the order, which was in writing, Gen. Blair expressed great confidence in the beneficial results which would flow from the measure, and his opinion seems to have been generally shared by others who had information on the subject. The validity of this reinsurance and transfer of assets has been adjudicated by the Circuit Court of St. Louis, confirming an elaborate report made by three able lawyers as referees. This adjudication has not been appealed from, and is, therefore, final. Upon the evidence before us this contract must be taken to have been a valid one, beneficial alike to the selling and purchasing company, and to those beneficially interested therein.

The committee which had charge of these negotiations, and of which, as already stated, the defendant was a member, was appointed to conduct the transfer of the assets. On or about February 15, 1874, when the transfer of the assets was completed and the contract stood executed, the Mound City Company settled the brokerage contract with Peck, making some deductions from the amount agreed

upon on account of unforeseen matters, and paying him altogether the sum of $149,409.93. This entire amount was paid in notes secured by real-estate mortgages which had been transferred to the Mound City Company by the St. Louis Mutual Company. Britton and Lomax, who were respectively president and secretary of the Mound City Company, drew up and submitted to the executive committee of their company a formal report, in which they stated in detail the amount expended by them on behalf of their company in order to effect the contract of reinsurance of the risks of the St. Louis Mutual Company, the total amount, including the brokerage fee of Peck, being $174,-268.51. They congratulated the committee that they had accomplished this result at a cost "less by $25,731.49 than the amount which was originally deemed sufficient to consummate this important and valuable transaction."

As soon as the contract of reinsurance was made, — a matter which was publicly known, — Wyman began to press Peck to make good his promise to pay the $15,000. Peck pleaded for time in which to raise the money, and Wyman, unwilling to wait longer, agreed to accept, in lieu of the $15,000, the bonds which had been placed in the hands of Mulliken in escrow, and which were worth then but sixty cents on the dollar. In other words, notwithstanding his written contract with Peck, which had been placed in the hands of Mulliken, he preferred to settle on the basis of $9,000, than wait and take his chances of getting $15,000. Wyman kept the bonds thus received until about a year thereafter, when, on the dissolution of the partnership firm of Priest & Wyman, he delivered half of them to Priest, thus treating them as partnership property.

Transactions of this kind are generally shrouded in mystery, and, no doubt, there is usually much more in them than appears in testimony. In this case the terms of the brokerage contract between the Mound City Company and Peck had been agreed on before it was signed — just

how many days does not appear. On the day before it was signed, namely, on the twenty-sixth day of November, 1873, the advisory committee of the St. Louis Mutual Company, which, as already stated, had in charge the subject of re-insurance, reported in favor of accepting the proposal of the Mound City Company to reinsure the risks of the St. Louis Mutual. And on November 28th, two days after this, and the day following the execution of the brokerage contract between Peck and the Mound City Company, Peck appears to have closed the bargain with Wyman. It is thus seen that the making of the brokerage contract with Peck, the report of the advisory committee recommending the measure, and the agreement between Peck and Wyman, were substantially simultaneous. On the other hand, there is no direct evidence that either Priest or Wyman knew, at the time they were approached by Peck, that he had thus contracted with the Mound City Company, and for all that appears, they may have supposed that Peck was willing to part with the $15,000 which he offered, to save himself and other stockholders from the total wiping out of their stock, which would have happened if the company had not been pulled through its difficulties.

This transaction between Peck and Priest & Wyman has all the ear-marks of a transaction which the parties making it were conscious would not bear the light. Priest was unwilling to close the negotiation with Peck, but referred him to his partner. Wyman was unwilling to trust Peck, and required security. When the time came when Wyman was entitled to demand of Peck the fulfilment of his agreement, he was afraid further to delay or to permit the security to remain longer in the hands of a third person; and, for the sake of getting possession of the fruits of the bargain, he was willing to settle on a basis of $9,000, instead of $15,000, which Peck agreed to give. A letter from Peck to Wyman dated the day when these two made the bargain together, was

carefully written so as to conceal the transaction, and at the same time to indicate his willingness to carry it out as agreed. It read thus: "If you desire it, I will purchase of you, within thirty days from this date, fifteen bonds of the Leavenworth, Atchison, and Northwestern Railroad, and will pay for them in cash, or, at your option, will give you in exchange for the above bonds, a like number of ten per cent bonds of the Vulcan Iron Company or St. Louis Gas-Light Company, which, if you desire, I will in a reasonable time convert into cash." The written agreement between Peck and Wyman, which was deposited with Mulliken when the bonds were placed in his hands in escrow, was destroyed. Wyman testified that he disclosed this transaction to no one except to Priest and Mulliken. He kept it very quiet because he thought he had better do so. Mr. Priest, who saw nothing wrong in the transaction, and would do it over again under like circumstances, likewise revealed it to nobody. He could not see any necessity for revealing it; his private business was not always a subject for public parade. Nor could he say that the transaction was ever entered on the partnership books of Priest & Wyman. Nor is the defence at all helped by the explanation of the transaction given by Wyman and Priest in their testimony. Wyman testifies that Peck agreed to pay him this large sum " for professional services" in bringing about the proposed transfer. He does not appear to have been an expert in life insurance matters, and he admits in his testimony that he had no special knowledge of the affairs of this company. Nevertheless, he claims to have earned this great fee by " laboring " with certain directors of the St. Louis Mutual Company, including his partner Mr. Priest. In so " laboring " he merely used the argument with which Mr. Peck had furnished him, the substance of which, as given in his testimony, was that the proposed scheme was the only way of helping the St. Louis Mutual Company out of its difficulties. Mr. Priest, on the other hand, under-

stands that this fee was made by the sale of stock of the St. Louis Mutual Company to the Mound City Company. As the stock of the former company was but $100,000 at par value, the sum of $15,000 as a brokerage fee for selling it, is obviously so large as wholly to preclude the conclusion that it could have been agreed upon as compensation for the ordinary and usual services of a broker or financial agent in effecting a sale of such an amount of securities. Besides, when pressed for details, Mr. Priest admits that he knows nothing about it; and his explanation, therefore, wholly fails. There is no warrant in this record for the inference that any substantial services were rendered by the firm of Priest & Wyman in consideration of this fee.

Now, this whole evidence, especially the concurrence of dates above pointed out, strongly suggests the inference that there was a preconcerted scheme on the part of Mr. Peck and one or more members of the advisory committee of the St. Louis Mutual Company to make what they could out of a transfer of assets which had become inevitable, through the company's misfortunes. But we need not resort to this inference for the purposes of this case. We may place the conclusion at which we are bound to arrive upon a lower, though not more probable ground. We may conclude that both Mr. Wyman and Mr. Priest supposed that Mr. Peck was offering this large sum for the purpose of saving the interest of himself and other stockholders. And what, then, is the position of Mr. Priest? The evidence wholly excludes the conclusion that he did not know of the bargain which had been entered into between Mr. Wyman and Mr. Peck. With this knowledge in his breast, he becomes, as the testimony shows, in the board of directors of which he was a member, an active advocate of the proposed measure; his associates, or most of them, no doubt supposing that he was giving them the result of his conscientious judgment, unbiased by any hope of private reward. The law will not permit a trustee thus to put him-

self in a position where his own interests are antagonistic to those of his *cestui que trust.*

The principles of law applicable to this transaction are very familiar and very well settled. Directors of a corporation are regarded by courts of equity as trustees for the corporation and for its members. *Great Luxembourg R. Co.* v. *Magnay,* 25 Beav. 586; *Gaskell* v. *Chambers,* 26 Beav. 360; *Hodges* v. *Screw Co.,* 1 R. I. 312. A court of equity will never permit a trustee, without the knowledge and consent of his *cestui que trust,* to speculate out of his trust, or to retain any gain which may have accrued to him personally therefrom, but will subject his conduct to a rigid scrutiny, and will compel him to account to his *cestui que trust* for all profits which he may make out of the trust relation. *Ex parte James,* 8 Ves. Jr. 337; *Fawcett* v. *Whitehouse,* 1 Russ. & M. 132; *Hichens* v. *Congreve,* 1 Russ. & M. 150, note; *Kimber* v. *Barber,* L. R. 8 Ch. 56; *Bentley* v. *Craven,* 18 Beav. 75; *Gillett* v. *Peppercorne,* 3 Beav. 78; *Michand* v. *Girod,* 4 How. 503; *Hamilton* v. *Wright,* 9 Cl. & Fin. 111; *Blisset* v. *Daniel,* 10 Hare, 493; *Tennant* v. *Trenchard,* L. R. 4 Ch. 537; *Bowes* v. *City,* 11 Moo. P. C. 463; *Tyrrell* v. *Bank,* 10 H. L. Cas. 26 (affirming *s. c.* 27 Beav. 273). This rule is applied with full force to directors of corporations. *Great Luxembourg R. Co.* v. *Magnay,* 25 Beav. 586; *Imperial, etc., Assn.* v. *Coleman,* L. R. 6 H. L. 189 (reversing *s. c.* L. R. 6 Ch. 558); *York* v. *Hudson,* 16 Beav. 485; *Parker* v. *McKenna,* L. R. 10 Ch. 96; *Parker* v. *Nickerson,* 112 Mass. 195; *Poor* v. *Railroad Co.,* 59 Me. 277; *Redmond* v. *Dickerson,* 9 N. J. Eq. 509; *Pickering's Case,* L. R. 6 Ch. 525; *Madrid Bank* v. *Pelly,* L. R. 7 Eq. 442; *Ex parte Bennett,* 18 Beav. 339; *Cumberland Coal Co.* v. *Sherman,* 30 Barb. 553; *Butts* v. *Wood,* 37 N. Y. 317; *Blake* v. *Railroad Co.,* 56 N. Y. 485. It may, we think, be stated as a universal application of this rule, that whenever a director of a corpora-

tion proposes to its shareholders, or to his co-directors, a contract, or, acting as such director, makes, assents to, or ratifies a contract for the corporation, from which he himself is to derive a secret profit, that profit belongs to the company, and he will be compelled, in a court of equity, to account for it and to surrender it up to the company. It is not essential to the liability of the director that the company has suffered a loss from what he has done; it is sufficient that he has gained a profit through it. Whether the contract which he has made, or in the making or ratification of which he has concurred, was in point of fact beneficial or injurious to the company, is wholly an immaterial inquiry. The broad principle is, that whatever he acquires by virtue of his fiduciary relation, except in open dealings with the company, such as a director in common with strangers may sometimes have, belongs not to him, but to the company. Nothing else than this satisfies the demands of the law.

The case before us falls clearly within this rule; so clearly that it would serve no useful purpose to set out in detail the above cases for the purpose of showing it. One of them, however, is singularly like the present in its facts. In *Gaskell* v. *Chambers*, 26 Beav. 360, a life insurance company, as in this case, transferred its assets to another company. The purchasing company paid to the directors of the selling company a considerable sum, under a secret agreement, which the directors of the selling company concealed from the members of their own company. Upon a bill in equity to compel them to account for this sum, they did, indeed, set up a colorable right to retain it, which the defendant in this case does not; they claimed it as " compensation for the loss of their offices." But Lord Romilly, M. R., held that they were trustees of this money for the members of their company, and they were compelled to pay it into court.

The defendant's counsel, while not conceding that such

is the fact, have made strenuous argument on the hypothesis, which they understood to be that of the plaintiff and of the court below, that the money which the defendant received was received as a bribe, and that a party cannot be heard in a court of justice to urge that another party be required to surrender up money which he has thus received. As between the two parties to the giving and taking of a bribe, the law will, of course, in a civil case, leave them where they have placed themselves, just as in the case of any other unlawful contract. But it would be a most mischievous inroad upon the doctrine we have stated, if the defendant's contention were to prevail. The object of the rule in question is to secure open-handed conduct, good faith, and fair dealing on the part of persons standing in fiduciary relations to others; and this can only be done by compelling them to surrender to the latter, in all cases, any secret profits which they have made out of their trust relation. If the profit has come to the trustee in the shape of a bribe, the reason is stronger for the application of the rule than in those cases where his conduct is clouded with less turpitude, as where he speculates in trust-funds, or secretly buys property for one price and sells it to his *cestui que trust* for a greater price. The object which the law has in view can only be attained when it is known that such a transaction cannot be moulded in any form or cloaked in any disguise which will enable the trustee to retain a profit which he has thus made.

But the defendant's counsel have confidently appealed, in support of this position, to the decision of the House of Lords in *Tyrrell* v. *Bank of London*, 10 H. L. Cas. 26. We confess that doubts were, for a time, cast upon the correctness of our view, by extracts from the opinions of the lords which were read to us at the bar, and which we found in the defendant's printed argument. It was only by a singular misreading of that case — by singling out certain extracts from the opinions, and by overlooking others, as

well as the decree itself — that counsel could have fallen
into such an error regarding it. The facts of that case
were shortly these: Tyrrell was solicitor of the Bank of
London, and Read, a stranger to the bank, was the owner
of a contract to purchase a piece of property in London, for
£49,200. Read and Tyrrell entered into a conspiracy to
sell their property to the bank at a price greatly above
this sum, upon an agreement that the profits should be
divided equally between them. By artful devices of Read
and Tyrrell, the bank was induced to make the purchase of
a portion of his property, through Tyrrell's acting as its
solicitor, for the sum of £64,500, which was placed in
Tyrrell's hands for that purpose. The Master of the Rolls
held that Tyrrell must not only account for the amount of
the money placed in his hands by the bank, which he had
retained as a profit, but that he must also be charged as a
trustee of the bank for his moiety of the unsold land. The
lords modified the latter portion of the decree. They held
that he could not be charged as a trustee for a moiety of
the unsold land; that is, that he could not be made to
convey this land to the bank, for the bank had not author-
ized him to purchase it. But at the same time they held
that he could not retain any profit whatever which had
come to him from the transaction, and they accordingly
entered a decree charging him with *the value* of such
unsold land. Lord Westbury, L. C., said: "My lords,
Tyrrell must receive from his clients, in his character of
vendor to his clients, only that sum of money which, as
between him and Read, Tyrrell must be taken to have paid
for the property conveyed to his clients; but that sum of
money must be ascertained in the following way: by
deducting from it the value of the unsold property included
in the contract between Read and Tyrrell, but not included
in the contract of sale to the clients." To this the other
lords agreed; and the decree directed by them contains
the following clause: "And that the value be ascertained

of the unsold property comprised in the said contract between the defendant Edward Rudston Read and the defendant Timothy Tyrrell, but not sold to the plaintiff, the Bank of London, as the same property stood at the day of the agreement of May 5, 1855 ; and it is ordered that one-half of such last-mentioned value, when so found, be deducted from the sum total of the moneys found to have been paid and expended by the defendant Timothy Tyrrell, or by his order, as aforesaid ; and his honor doth declare that the difference between the balance thus obtained and the sum of £32,250, being one moiety of the purchase-money paid by the Bank of London under the agreement of May 5, 1855, is a debt due from the defendant Timothy Tyrrell to the Bank of London," etc. It is thus seen that this case is not an authority for the proposition for which the counsel have cited it, but for the reverse. Nay, the lords expressed their regret that the bill had been dismissed as to Read, the confederate of Tyrrell, who did not stand in a fiduciary relation to the company, intimating an opinion that he also could have been charged for what the bank lost through his share in the transaction. This case, then, is not only an authority to support the action of the Circuit Court in charging Priest, but these intimations of the lords, if correct, go to show that Wyman, who occupied a similar position in this case to that occupied by Read in that, might also have been compelled to surrender up *his* share of what was made out of the transaction.

4. It remains to consider the defence of the Statute of Limitations. The section of the statute which enumerates the actions which may be commenced within five years contains this clause : " Fifthly, an action for relief on the ground of fraud, the cause of action in such cases to be deemed not to have accrued till the discovery by the aggrieved party at any time within ten years, of the facts constituting the fraud." Rev. Stats., sect. 3230 In our

opinion this case falls within this clause of the statute. *Hunter* v. *Hunter*, 50 Mo. 445. It is sufficient that the suit was brought within five years of the time of the discovery of the facts which gave the cause of action, so that not more than ten years have elapsed in all from the doing of the acts. This was clearly the case here; and if an active effort at concealment were necessary, the evidence shows that such an effort was made. Statutes of limitation have not generally been held to run in the case of constructive trusts having their origin in fraud (1 Perry on Tr. (2d ed.), sect. 230); and our Supreme Court has lately held that the statute cannot be invoked in behalf of a title fraudulently acquired in violation of a trust. *Chouteau* v. *Allen*, 70 Mo. 291, 341.

This disposes of all the questions which arise under the present appeal. The plaintiff has made some other questions under a writ of error sued out by him; but as this writ of error is docketed as a separate cause in this court, those questions will be separately considered.

It results that the judgment must be affirmed. The other judges concur.