CARSON v. ALLEGANY WINDOW GLASS CO. et al.

(Circuit Court, D. Delaware. May 15, 1911.)

No. 291.

1. CORPORATIONS (§ 553*)—APPOINTMENT OF RECEIVER—JURISDICTION.

While there is no statutory authority in Delaware for the appointment of a receiver of a solvent private manufacturing corporation, a circuit court of the United States sitting as a court of chancery may in the exercise of its general equity powers properly constitute such a receivership under exceptional and exigent circumstances as, for instance, where it has become impossible for the corporation to answer any of the ends of its creation or where there has been such fraudulent, willful or reckless mismanagement of its business and affairs by its board of directors as to produce a conviction that further control of the corporation by the same board would result in the destruction of its business and insolvency or cause great and unnecessary loss to its creditors or stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2201-2216; Dec. Dig. § 553.*]

2. CORPORATIONS (§ 553*)—RECEIVERS—APPOINTMENT.

No mere differences of opinion among the stockholders or directors as to the business methods or policy of the corporation can of themselves constitute a legitimate ground on which to vest in a receiver control and management of the corporate property and franchises.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2201-2216; Dec. Dig. § 553.*]

3. CORPORATIONS (§ 553*)—RECEIVERS—GROUND FOR APPOINTMENT.

Mere irregularities or minor and comparatively trivial faults of commission or omission on the part of the directors and officers of the corporation, not amounting to flagrant disregard of their official duty showing their unfitness to control its business and establishing the probability of serious and substantial disaster or ruin to the corporate enterprise should they further continue in charge, will not afford sufficient ground for the appointment of a receiver.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2201-2216; Dec. Dig. § 553.*]

4. CORPORATIONS (§ 557*)—RECEIVERS—GROUNDS FOR APPOINTMENT.

To justify the appointment of a receiver of a corporation on the ground of fraud on the part of its directors in the conduct of its affairs, the bill must definitely allege facts and the allegations must be strictly proved.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2227-2236; Dec. Dig. § 557.*]

5. CORPORATIONS (§ 155*)—SALE OF MANUFACTURED PRODUCT—PAYMENT OF DIVIDENDS.

The court will not at the instance of a minority stockholder of a solvent manufacturing corporation order a sale of its manufactured product and the application of the proceeds to the payment of dividends declared

and unpaid, the application of its funds to the payment of dividends being within the legitimate functions of the board of directors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 560–603; Dec. Dig. § 155.*]

6. CORPORATIONS (§ 320*)—SUIT BY STOCKHOLDER—CANCELLATION OF CONTRACT.

In a suit by a stockholder of a solvent corporation on behalf of himself and other stockholders for the cancellation of a contract between that corporation and another on the ground that it was fraudulently procured and improvident, the court in the absence of evidence to the contrary may infer from the fact that no other stockholder has sought to intervene that the other stockholders do not view the contract unfavorably or that they believe that the setting aside of it under the circumstances would be more detrimental to than promotive of their interests as stockholders.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 320.*]

7. CORPORATIONS (§ 317*)—SUIT BY STOCKHOLDER—SETTING ASIDE CONTRACT.

The mere fact that the president of a corporation, who owns the majority of its stock, has been guilty of such fraud in procuring the execution by it of the contract as would warrant the setting aside of the contract on a bill brought by the corporation, does not justify the court in setting it aside at the suit of a minority stockholder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401–1415; Dec. Dig. § 317.*]

8. COURTS (§ 307*)—FEDERAL COURTS—JURISDICTION.

Where the joinder of an indispensable party will oust the jurisdiction of a federal court having cognizance of the cause on the ground of diversity of citizenship the party seeking relief must proceed in a state tribunal.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 307.*]

In Equity. Suit by Catherine E. Carson against the Allegany Window Glass Company and Robert W. Hilton. Bill dismissed.

Saulsbury, Ponder & Morris and Rufus B. Stone, for complainant. Marvel & Marvel and E. R. Mayo, for defendants.

BRADFORD, District Judge. The Allegany Window Glass Company, one of the defendants, hereinafter referred to as the glass company, is a corporation of Delaware engaged in the manufacture of window glass, and having its principal place of business at Port Allegany, McKean County, Pennsylvania. Robert W. Hilton, the other defendant, who is a director and the president of the glass company, is a citizen of Pennsylvania. Catherine E. Carson, the complainant, is a citizen of New York, and a stockholder of the glass company. The allegations of the bill are to the general effect that the defendant Hilton is, and during the period when the various acts complained of occurred was, the president and a director of the glass company and the owner and holder of over sixty per cent of its capital stock, the complainant being one of the minority stockholders; that during that period Hilton was president of the Ormsby Gas Company, hereinafter referred to as the Ormsby company, engaged in producing and supplying natural gas, and by virtue of ownership of capital stock controlled that company, his interest in the Ormsby company being greater than his interest in the glass company; that natural gas was used by the

glass company for the manufacture of glass from the time it commenced operations in 1901; that the glass company had obtained its initial supply of natural gas at certain rates specified in the bill, and such supply prior to 1904 had become inadequate for the full operation of its plant; that in 1904 the Manufacturers Gas and Fuel Company, hereinafter referred to as the manufacturers company, offered to enter into a contract with the glass company to supply to it all the natural gas it would require for a period of three years, delivered at the plant of the glass company, at certain rates specified in the bill; that such offer was fair and favorable to the glass company and was submitted to its board of directors, but Hilton, having in view his larger interest in the Ormsby company and possessing by virtue of his ownership of a majority of the capital stock of the glass company a controlling influence with its board of directors, opposed the acceptance of the offer which by reason of such opposition and influence was rejected; that the supply of natural gas available to the glass company was immediately prior to the rejection of the above offer restricted to the manufacturers company, the Ormsby company and the Citizens Gas Company, hereinafter referred to as the citizens company, then inadequately supplying the glass company under a contract shortly thereafter to expire; that Hilton induced the rejection of the offer of the manufacturers company knowing that such rejection was against the interests of the glass company, and in order to promote his personal advantage by compelling the latter company to resort to the Ormsby company for its supply of natural gas upon such terms as the last named company should dictate; that following the rejection by the glass company of the offer of the manufacturers company, Hilton, in violation of his fiduciary relations to the glass company and without action on its part or consultation with its board of directors, negotiated for it the purchase from the Ormsby company of certain gas and oil leaseholds represented by him to be productive of natural gas, at an exorbitant price fixed by himself with the Ormsby company, and subject to a certain agreement on the part of the glass company to drill wells, the consideration coming to the Ormsby company being a comparatively small cash payment by the glass company and the payment by it to the Ormsby company for each 1,000 feet of natural gas at a certain rate specified in the bill, the cost of production and transportation of such gas to be borne by the glass company; that the effect of the above contract of purchase was for an indefinite period to transfer to the Ormsby company largely for the use of Hilton the entire surplus and profits which the glass company and its stockholders would have derived and enjoyed from the operation of its plant; that before any formal action was taken by the directors or stockholders of the glass company touching such contract of purchase, Hilton unlawfully and fraudulently took of its funds $2,100 "to pay to himself" on account of the consideration coming to the Ormsby company under such contract of purchase, and the further sum of $900 "to replace in the treasury of the company money taken from it by him without right or authority" to purchase in his own name "stock in a corporation manufacturing a certain patent glass machine"; that the complainant in March, 1906, protested to

Hilton against the above mentioned contract of purchase and the misappropriation by him of the funds of the glass company, but such contract of purchase was on or about September 24, 1906, against the protest of the complainant through her attorney in fact ratified by the stockholders of the glass company, Hilton through his ownership of a majority of the capital stock and his misrepresentations securing that result; that such contract of purchase has proved of "great and incalculable detriment and injury" to the glass company; that no dividends have since been received by its stockholders but its funds available for that purpose have been arbitrarily expended by direction of Hilton in drilling wells for the purpose of meeting personal obligations on his part arising out of the affairs of the Ormsby company and in "matters of his own personal expense as, for instance, in the cost of keeping his own driving horses"; that Hilton without authority on or about January 1, 1904, withdrew from the treasury of the glass company $2,500 which under remonstrance from the complainant was subsequently in whole or in part refunded by him; that he procured the sale of capital stock of the glass company to one of his relatives then serving as its secretary and treasurer for the consideration of a promissory note for $2,500 given by the latter, such note, not constituting lawful consideration for the purchase of such stock; that the glass company "under the direction and influence" of Hilton within two years before the commencement of this suit entered into the National Brokerage Association, "formed for the unlawful purpose of increasing the selling price of window glass by means of keeping the factories of the constituent companies closed after the expiration of the usual closed season, and thereby curtailing the manufacture of window glass," by reason whereof the output or product of the glass company of the value of more than $40,000 "has been retained for long periods of time in its storerooms at the cost of insurance, interest and taxes thereon," whereby the glass company "has suffered in great measure the loss of its market, its good will and its credit, and the interests of its minority stockholders have been sacrificed, prejudiced and disregarded"; that the factory and site of the glass company are covered by a mortgage on which the sum of about $15,000 is due and unpaid, and foreclosure is now threatened; that a judicial sale of its factory and site would leave the glass company in possession of its franchises but "stripped of its property, and powerless to resume operations"; that "in the manner aforesaid, and by divers means in like manner," Hilton and the other directors of the glass company controlled by him have in wrongful and fraudulent disregard of their fiduciary duty to the minority stockholders so mismanaged the affairs of the company that its capital stock has lost one half of its value and is rapidly depreciating and the company is "involved in debt and on the verge of insolvency"; and that the continuance in the management of the glass company of Hilton and the directors associated with him "is a menace to the best interests of said minority stockholders, and threatens to still further impair and eventually destroy the value of their stock and of the property, good will and credit of the said defendant company." In addition to subpoena and answer, the bill

prays for (1) the appointment of a receiver "to take charge of all the property and assets" of the glass company and "to manage the said company for the best interests of all its stockholders"; (2) an order that "the merchantable manufactured product" of the glass company on hand "be sold at the best price obtainable therefor, and the proceeds thereof applied in payment of the dividends declared and unpaid"; (3) an order that the glass company withdraw from the National Brokerage Association, "if now connected with it"; (4) a decree canceling the contract of purchase between the glass company and the Ormsby company and directing the defendant Hilton to account to the glass company "and it to the plaintiff herein for all moneys due, and for all losses and damages, which it and the said plaintiff, respectively, have sustained in the premises"; (5) an injunction, "preliminary until hearing, and perpetual thereafter," restraining the glass company "from making sale, pledge or lease or otherwise in any manner disposing of or encumbering the property, or any part thereof, of said company, excepting only current sales of glass"; and (6) other and further relief.

[1] The prayer for a receiver will first be considered. By the act of March 25, 1891, c. 181, vol. 19, Del. Laws, it is provided that whenever a corporation other than for public improvement "shall be insolvent, the Chancellor, on the application and for the benefit of any creditor or stockholder thereof, may, at any time, in his discretion, appoint one or more persons to be receivers of and for such corporation, to take charge of the estate, effects, business and affairs thereof, * * * the powers of such receivers to be such and continued so long as the Chancellor shall think necessary." The statute contemplates two classes of cases: (1) proceedings which may result in the full and final administration and distribution on an equitable basis of the assets of the insolvent corporation among its creditors, and, should a surplus from any cause exist, among its stockholders, subject to valid existing liens, if any; and (2) proceedings which may result in the taking possession of such assets and their retention by the court until such time as by a prudent, economical and successful management of the affairs of the insolvent corporation it may be restored to solvency. Jones v. Mutual Fidelity Co. (C. C.) 123 Fed. 506, 523. But while the bill avers that the glass company has been brought to "the verge of insolvency," it does not allege nor does it appear from the evidence that it is insolvent. In fact its solvency was admitted by counsel in open court during the argument. Insolvency not existing, there is no statutory authority in Delaware, state or federal, for the constitution of a receivership in such a case as the present.

The right to appoint a receiver, if it exists, must, therefore, be found in the general equity powers of this court sitting as a court of chancery.

[2] The bill does not contemplate a winding up of the affairs of the glass company and a distribution of its assets among creditors and stockholders, but seeks the appointment of a receiver "to manage the said company for the best interests of all its stockholders" for

an indefinite period and without limitation as to time. What the complainant asks, in substance, is that this court substitute a receiver of its appointment for the board of directors of the glass company, a strictly private corporation, to exercise, until otherwise ordered, the corporate franchises on the ground of alleged mismanagement and disregard of fiduciary duty on the part of the directors detrimental to the interests of the company and its stockholders and threatening disaster to them in the near future. To justify the continued exercise of its corporate powers by the court through the instrumentality of a receiver, a strong and clear case must be established. The board of directors of the glass company is charged by the statute under and by virtue of which it was organized and exists, with the control and management of its business and affairs; and when the law-making power has declared that the business and affairs of a corporation, created and organized under that power, shall be directed by its board, it ill becomes courts created for the administration of the law, unless under special and exigent circumstances, to declare that its business and affairs shall not be directed by such board. Sellman v. German Union Fire Ins. Co. (C. C.) 184 Fed. 977. Special and exigent circumstances may, in the absence of a statute, warrant and justify a receivership of a corporation, although solvent, for the purpose of winding up its affairs and distributing its assets or of temporarily taking charge of and protecting its property and managing its business and affairs. If it has become impossible for the corporation to answer any of the ends of its creation and it has thus utterly failed of its purpose a court of equity would, under its general jurisdiction and powers and wholly aside from any statutory provision in that behalf, be authorized to wind up its business and affairs for the benefit of those really interested, namely, its creditors and stockholders, although not involving a dissolution or termination of the corporate franchise. So, although the legitimate purposes of a corporation may not have become impossible of accomplishment, if the facts clearly disclose such fraudulent, wilful or reckless mismanagement of its business and affairs by its board of directors as to produce a conviction that further control of the corporation by the same board would result in the destruction of its business and insolvency, or cause great and unnecessary loss to its creditors or stockholders, a receivership properly may be constituted. [2] But no mere differences of opinion among stockholders or directors as to business policy or methods pursued or to be pursued by the corporation can of themselves constitute a legitimate ground on which to vest in a receiver control and management of the corporate property and franchises. In Republican Mountain Silver Mines v. Brown, 58 Fed. 644, 7 C. C. A. 412, 24 L. R. A. 776, the circuit court of appeals for the eighth circuit said:

"A court of equity has no power to interpose its authority for the purpose of adjusting controversies that have arisen among the shareholders or directors of a corporation relative to the proper mode of conducting the corporate business, as it may do in case of a similar controversy arising between the members of an ordinary partnership. Corporations are in a certain sense legislative bodies. They have a legislative power when the directors or shareholders are duly convened that is fully adequate to settle

all questions affecting their business interests or policy, and they should be left to dispose of all questions of that nature without applying to the courts for relief. A stockholder in a corporation cannot successfully invoke the power of a chancery court to control its officers or board of managers, or to wrest the corporate property from their charge through the agency of a receiver, so long as they neither do nor threaten to do any fraudulent or ultra vires acts, and so long as they keep within the limits of by-laws which have been prescribed for their governance. If in either of the cases last specified a stockholder is nevertheless dissatisfied with the business policy that is being pursued, or the methods of corporate management, he must seek redress within the corporation, in the mode prescribed by its charter and by-laws, rather than by an appeal to the courts."

In Ranger v. Champion Cotton-Press Co. (C. C.) 52 Fed. 609, Judge Simonton in denying a motion for the appointment of a receiver of a solvent private corporation said:

"This motion is, in effect, to take the control of this company out of the hands of the majority of its stockholders and put it under the control of the court and its receiver; this, too, at the request of a person who is in a minority of the stockholders. The majority entertain and favor a certain method in the management of the affairs of the company, by which a large, and perhaps uncontrolled, power is given to the president. He thinks this all wrong. The majority have confidence and trust—up to this stage of the case, a remarkable degree of confidence—in their president. He has no confidence in him whatever, and is willing to believe the worst of him. The complainant, therefore, invites the interference of the court to remove this president, and change this, to him, dangerous method. He bases his prayer for the favorable consideration of the court upon the fact that he is a stockholder. But so are the others. Each one of them has as much right to the aid of the court, and to its interference, as he; and, as the aggregate of them have a larger number of shares than he, this majority have a paramount claim upon the court. * * * One of the results of membership in a corporation—one of the evils, we may say—is that the minority are largely under the control of the majority. So long as the latter act in good faith, and within the constitution and by-laws of the corporation, they can adopt any line of policy which commends itself to their judgment, however great may be the hostility of the minority to it, or however deep their conviction that it is destructive of their interests."

[3] The vital question touching the propriety of appointing a receiver as prayed is not whether there have been mere irregularities or minor and comparatively trivial faults of commission or omission on the part of the directors and officers of the glass company, but whether there has been such fraud, wilfulness or recklessness in their management of its property and affairs,—such flagrant disregard of their official duty,—as to show their unfitness to control its business, and to establish the probability of serious and substantial disaster or of ruin to the corporate enterprise should they further continue in charge. Certainly the appointment of a receiver could not be justified on the ground that the glass company formerly was a member of the National Brokerage Association, its connection with that body having ended in the summer of 1907 when that association ceased doing business; nor on the ground that the company at sundry times prior to the commencement of this suit made certain cash advances to Hilton, the complainant, and other stockholders on account of dividends to be declared, all such advances having been covered by and deducted from the amount of such dividends, and having been made

without fraud or concealment, and the sum of $2,500 received by Hilton September 30, 1904, but erroneously` alleged in the thirteenth paragraph of the bill to have been received on or about January 1, 1904, being one of such advances; nor on the ground that Hilton at a time when he served as president without charging or receiving a salary was permitted by the company to keep his driving horses in. its stable; nor on the ground that the company took the promissory note of Hilton's uncle, who was then its secretary and treasurer, for a number of shares of the original issue of capital stock, which were for a time held and retained for him, he having subsequently made full payment in cash for five of them and abandoned all claim for the balance; nor on any or all of these grounds. To wrest the possession and control of the property and affairs of the glass company from its board of management and substitute a receiver for such trivial considerations as the above would betray a lack of all proper sense of proportion.

The bill alleges that the secretary of the company refused the complainant access to its books. This allegation is denied in the answer where it is averred that she has always had free and unobstructed access to all the books and correspondence of the company. Assuming, however, that she or her agent was refused such access, such refusal while it might serve as ground for the awarding of a mandamus by a court of competent jurisdiction would not justify the appointment of a receiver. While denouncing Hilton's acts and motives the bill does not charge, either in form or in substance, that there was any conspiracy or corrupt or wrongful combination or collusion between him and the other directors, or any of them, to ruin or otherwise injure the company, its business or property; or that the other directors were actuated by any fraudulent or wrongful purpose in determining the policy and managing the affairs of the company; or that the other directors on any specific occasion did not observe good faith in their action and conduct as members of the board. The bill abounds in epithets of fraud, but with respect to fraud adjectives cannot supply the place of facts. [4] To sustain a charge of fraud the .facts constituting it must be definitely set forth in the pleadings and strictly proved. The charges made in the bill against the other directors as such, while misleading on a superficial reading, clearly are inadequate. Thus, in the fifth paragraph of the stating part of the bill it is alleged with respect to the rejection of the offer made by the manufacturers company to supply gas that Hilton "by virtue of his ownership of a majority of the stock of the Allegany Window Glass Company having a controlling influence with its board of directors, opposed the acceptance of the said proposition, and by reason of his opposition and undue influence it was thereupon rejected." In the fourteenth paragraph it is alleged that the glass company "under the direction and influence" of Hilton entered into the National Brokerage Association. And in the seventeenth paragraph it is alleged that "in the manner aforesaid, and by divers means in like manner the said Robert W. Hilton and the directors of the said Allegany Window Company, elected by him by virtue of his majority

interest, have wrongfully and unlawfully and in fraudulent disregard of their fiduciary relations to the minority stockholders of said company, controlled and mismanaged the said corporation." The only charges to which the words "in the manner aforesaid, and by divers means in like manner" can have any pertinency are those contained in the fifth and fourteenth paragraphs which afford absolutely no justification for the application of the language, above quoted from the seventeenth paragraph, to the directors other than Hilton. As applied to them it fails to commend itself to the court and is vituperative. Nor is it warranted by the evidence. Directors may be elected by the holder of a majority of the stock of a corporation and yet be free agents and honest men. The fact that they have been so elected does not necessarily or usually convert them into mere puppets to further any fraudulent or wrongful scheme that may be proposed by the majority stock owner. The presumption of honesty and fair dealing is not destroyed. In fact there is evidence here that on one or more occasions the views of the other directors prevailed against those of Hilton. And, further, the evidence does not show that on any occasion the board was induced by Hilton against the honest judgment of a majority of his co-directors to take or omit action touching the conduct or affairs of the company.

The glass company is a solvent going concern. It enjoys an enviable reputation for skill in the operation of its plant, and its manufactured product commands a premium in the market. The allegation in the bill, on information and belief, that foreclosure of a mortgage, on which there is due a balance of $15,000, covering the factory and site of the company, is threatened, has been completely refuted by the evidence. Under the circumstances necessity does not require nor would propriety permit the appointment of a receiver as prayed. A receivership, as before stated, is here sought, not for the purpose of winding up the affairs of the company and making distribution of its property and assets, but to carry on its business in the exercise of its corporate franchises for an indefinite period. Such receivership could not of itself rescind the contract of purchase between the glass company and the Ormsby company, or secure redress for any wrongs alleged to have been suffered by the former at the hands of any of its officers or directors. A receivership is wholly unnecessary to that end; for full redress for such wrongs, if inflicted, could after proper but unsuccessful effort to induce the company to take action be secured through proper proceedings instituted by one or more of its stockholders. Further, while injunctive relief might well be granted against any illegal, ultra vires, wrongful or fraudulent acts, calculated to inflict injury and loss upon the company, threatened by Hilton or any other of its officers or directors, this court cannot undertake to forfeit Hilton's majority stock ownership or, under the circumstances, deprive him, even though temporarily, of the right legitimately to exercise the control incident to such ownership. If the power possessed by Hilton through his ownership of a majority of the stock to control the election of directors and thus indirectly to influence the policy and conduct of the company were of itself a sufficient ground

for the appointment of a receiver, the receivership logically should be continued until Hilton's death or the alienation of his majority ownership, whichever event should first occur, and for and during that uncertain period this court would be engaged wholly unnecessarily in carrying on the private business of manufacturing window glass, and that, too, with probably no assistance from the persons on the present board who have had extensive and practical experience in the conduct of the business and affairs of the company. The creation and indefinite continuance of a receivership would most seriously impair the reputation and standing of the company and in all likelihood produce a condition requiring the winding up of its affairs, the distribution of its assets, and practically, though not theoretically or technically, the termination of the corporate enterprise. Such a result should be avoided even on the assumption that the contract of purchase between the glass company and the Ormsby company was unwise, improvident and improper.

In some of its features this case is strikingly similar to Worth Mfg. Co. v. Bingham, 116 Fed. 785, 54 C. C. A. 119. There, however, the corporation was insolvent. The circuit court of appeals for the fourth circuit in reversing a decree appointing a receiver said:

"The chief ground of complaint was the purchase of the Engleworth Mills at a price beyond their value, alleged to have been brought about by the contrivance of two directors, but sanctioned by a unanimous vote of the stockholders. Because of this purchase and the alleged total insolvency of the corporation, they pray its dissolution, the winding up of its affairs. To this end the receivership is prayed. * * * It must be kept in mind that this is a private corporation, a business enterprise; that it is governed by the votes of its stockholders; that they are the judges, and the best judges, as to the conduct of their own enterprise, and that when a majority adopt in good faith a line of policy which, in their opinion, will best subserve the interests of the enterprise, the minority must yield. * * * The most grave charge is that there was fraud in the purchase of the Engleworth Mills. There is no presumption of fraud. The sole question is, does the record disclose a fraud so manifest, a necessity so stringent, as to justify the court in taking possession of this enterprise, winding up its business, and terminating its existence? * * * We then have this condition of affairs: In a private corporation all the directors and a large majority of stockholders, in the exercise of their judgment, purchase a piece of property, believing it to be for the best interest of the enterprise. A minority object. Does this authorize the dissolution of the corporation, the cessation of all its business, the taking away of all of its property out of the hands of the corporation and putting it in the hands of receivers? The question answers itself. Even were it a fraud, or an act ultra vires, the court cannot be asked to destroy the whole enterprise in order to correct a wrong done to the enterprise."

The course pursued by the complainant in the conduct of this cause amounts to an admission by her that the appointment of a receiver of the glass company is not a matter of necessity or of urgency. The bill was filed October 9, 1908, and on the same day on her motion a restraining order was awarded to restrain the glass company, its officers and directors, until the decision upon the motion for a preliminary injunction, or the further order of the court, "from making sale, pledge or lease or otherwise in any manner disposing of or encumbering the property" of that company, or any part thereof,

"excepting only current sales of glass." This exception is expressed not only in the motion for the restraining order but in the prayer for injunctive relief, preliminary and perpetual. Yet the right of the existing officers and directors to sell glass carries with it the right to receive the proceeds of sale and to have charge and custody of the fund derived from that source. It is difficult, if not impossible, to reconcile the willingness of the complainant that the glass company should receive and handle the proceeds of glass sold by it with the position taken by her that there has been such fraud, wilfulness, recklessness and disregard of fiduciary duty on the part of the present management as to show it to be unfit to have possession or control of the corporate property and assets or to exercise the corporate franchises. Further, the parties by their respective solicitors, entered October 28, 1908, within three weeks after the filing of the bill, into a stipulation, made part of the record, which contained, among others, the following provisions:

"1st. That further proceedings in the cause above entitled as to the appointment of a receiver for said defendant corporation, as prayed for in said plaintiff's bill of complaint, be postponed to abide the result of the trial of said cause.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

3rd. That in the meantime [until the final determination of this cause] the said defendant corporation be empowered and permitted to pursue the general business of said corporation in manufacturing and selling their manufactured product."

Thus the complainant was willing, not only that "current sales of glass" should be made by the company, but that it should until the final determination of this cause, which already has been in progress for more than two years and a half, pursue its general business of manufacturing and selling glass. The stipulation is certainly not suggestive of any apprehension on the part of the complainant that ruin or financial disaster to the company or its stockholders would result from the further continuance of the existing management in control of the corporate property, business and affairs. She expressly agreed that further proceedings for the appointment of a receiver should be postponed "to abide the result of the trial of said cause." On the whole it is quite clear that no case for the appointment of a receiver has been established, and that the prayer in that behalf and that for injunctive relief must be denied.

[5] The prayer that the merchantable manufactured product of the glass company on hand be sold and the proceeds applied to the payment of dividends declared and unpaid must also be denied, on the ground that, like a receivership, it would involve without necessity an invasion of the legitimate functions of the board of directors and wrest from it the determination of the wisdom, policy or practicability of making such sale and application under existing circumstances, regard being had to the form and amount of the corporate assets and the obligations or liabilities of the company.

The allegation in the eighth paragraph of the bill to the effect that prior to any formal action by the directors or stockholders of the glass company on the contract of purchase from the Ormsby com-

189 F.—51

pany Hilton unlawfully and fraudulently appropriated of the funds of: the former company $2,100 on account of the consideration coming to the latter company and $900 to replace in the treasury of the glass company money taken from it by him without authority to purchase stock in a corporation manufacturing a patent glass machine is not sustained by the evidence. The contract of purchase is evidenced by a written offer contained in a letter dated February 24, 1906, from Hilton, acting for the Ormsby company and himself, to the secretary of the glass company, which offer was accepted by the board of directors of the latter company June 2, 1906, and was subsequently ratified by the stockholders of that company September 24, 1906. The letter is as follows:

"Smethport, Pa., Feb. 24, 1906.

H. R. Hilton, Secy., Port Allegany, Pa.—

Dear Sir: Proposition for sale of Tretton gas lease 80 acres and other leases 470 acres owned by Ormsby Gas Co., is $40000. Payment $20000 in notes with certain collateral $3000 in cash and $2000 payable after the $23000 is paid from Tretton lease all drawing interest until paid which makes the $25000 for Tretton lease. Price of $15000 for the other property amounting to about 470 acres paid for by the thousand at the rate of eight cents per thousand for only gas taken out of the 470 acres with interest on, the $15000 payable every four months when a credit of gas is to be given on amount taken out at the price of eight cents. Understand this eight cents is not a royalty, but a style of paying instead of giving notes or cash for the $15000, so that the price of eight cents stops just as soon as the $15000 is paid. There is the advantage that the Company never makes any of this payment of $15000 unless it is produced by this property, so that the income out of the Tretton lease or Taylor will not have to assist as payment of this amount. Practically all that the Company will have to pay me is $23000 unless produced out of property.

Yours respectfully,            R. W. Hilton."

The provision in the contract for a cash payment of $3,000 was satisfied in the following manner according to the evidence. During the winter of 1905–6 the Ormsby company—Hilton by reason of the ownership of its capital stock virtually being that company—had furnished gas to the citizens company which in turn was supplied by it to the glass company. The citizens company being slow in making payment for gas received from the Ormsby company, Hilton after the gas so furnished by him through the latter company had been supplied to and consumed by the glass company asked the last named company to make payment of the amount due for it directly to him. This was done; the glass company giving its check January 23, 1906, to Hilton for $975.76 for gas furnished by the Ormsby company to the citizens company during December, 1905, and its further check February 21, 1906, to him for $834.22 for gas furnished by his company to the citizens company during January, 1906. June 23, 1906, three weeks after the contract of purchase had been entered into by the acceptance by the board of directors of the glass company of Hilton's offer as contained in his above quoted letter of February 24, 1906, the glass company, crediting itself with the above two payments aggregating $1,809.98, paid Hilton $1,190.02, being the difference between the aggregate amount so credited and the sum of $3,000 contracted for as a cash payment. I can per-

ceive no fraud in this transaction. Had the contract of purchase not been entered into Hilton, of course, could not have compelled the citizens company to pay to his company the amount advanced by the glass company and thus have secured double payment, and the citizens company being relieved to the extent of its indebtedness to the Ormsby company could have held the glass company liable only for the difference, if any, between what the citizens company had agreed to pay for the gas received by it and what the glass company had agreed to pay to the citizens company for the gas supplied to it by the last named company. But the contract of purchase having been entered into and the two sums advanced by the glass company to Hilton as above stated having been credited on the sum of $3,000 agreed to be paid in cash, the right of Hilton or the Ormsby company to receive full payment for the gas furnished to the citizens company during the two months above specified, and the right of the citizens company to receive full payment from the glass company for the gas so supplied during that period, remained wholly unaffected by the above mentioned advances by the glass company to Hilton. If the portion of the eighth paragraph of the bill charging fraudulent appropriation by Hilton of moneys on account of the consideration coming to the Ormsby company under the contract of purchase was intended to apply to the transaction just explained it has no justification.

[6] The prayer for the cancellation of the contract of purchase between the glass company and the Ormsby company remains for consideration. The complainant denounces the transaction as iniquitous in itself and as having been induced through fraud and undue influence on the part of Hilton. The latter denies fraud or undue influence and contends that the contract was reasonable and fair, and was after due inquiry and investigation ratified by both the board of directors and the stockholders of the glass company. The evidence on this branch of the case is voluminous and on a number of points conflicting. It has been carefully considered; but a discussion of it in detail is impracticable and would be well-nigh interminable. A statement of conclusions reached rather than of the particular evidence from which they have been drawn is all that shall be attempted. There are, however, certain circumstances in or surrounding the case which are not without much significance on the question whether the contract of purchase was, as claimed in the bill, a "profligate contract of purchase, in which the defendant company is still hopelessly involved," and "of great and incalculable detriment and injury" to the glass company, or, as also claimed on the part of the complainant in the brief of her solicitors, a "compulsory sale by the defendant, Hilton, of certain comparatively worthless property of his own to the defendant corporation, of which he was in control." Apart from the considerations hereinbefore discussed in connection with the prayer for a receivership, including the stipulation of October 28, 1908, there is the fact that, although the complainant sets forth that the bill is filed "for herself and in behalf also of other stockholders of the defendant company in like manner aggrieved," no other stockholder has either intervened or applied for leave to intervene in the

case. The complainant stands alone as the complaining party. Yet this court having jurisdiction of the subject-matter and over the parties as they now stand on the record by reason of diversity of citizenship and the amount in controversy, any other stockholder by virtue of his stock-ownership and regardless of his citizenship or the value of his stock, was entitled to intervene by leave of the court. That no other stockholder has sought to intervene justifies, in the absence of evidence to the contrary, an inference, by no means conclusive of the case it is true, that the other minority stockholders either do not view the contract of purchase as unfavorably as does the complainant or believe that the setting aside of that contract under existing circumstances would be more detrimental to than promotive of their interests as stockholders. Further, there is no evidence that of the minority stockholders, other than the complainant, more than a small proportion in number or amount sympathize with the purpose of the bill. Again, there is no evidence that Hilton used any threats or improper or undue influence upon or against any director or stockholder of the glass company to secure the acceptance by it of the offer contained in his letter of February 24, 1906, or that he even asked any other director or stockholder to vote for it. Nor has any director or stockholder of the glass company who voted for it testified that in so voting he deemed that the interests of Hilton rather than those of the glass company were being promoted, or that his vote represented anything else than his own honest judgment. Their testimony is directly to the contrary. Still further, it appears from the evidence that Hilton did not vote as a member of the board of directors of the glass company for the acceptance of the offer of February 24, 1906, nor after it had been accepted by the board did he vote as a stockholder for the ratification of the contract, but abstained from voting on either occasion in order that the minority stockholders and their representatives on the board might not be controlled or unduly influenced by him on either occasion, but feel free to pursue such course as should commend itself to them. And again, before the glass company accepted Hilton's offer the directors caused the property covered by it to be carefully valued by competent judges. John Troy, president of the Crosby Gas Company, after examining the record of the actual sales of gas from the Tretton leaseholds during five consecutive months preceding May, 1906, together with a map of the Hackett-Stickles leasehold showing the test of that territory with the capacity of certain wells drilled thereon, reported in favor of an acceptance of the offer. It appears from the evidence that Troy's services were secured for the making of such valuation at the suggestion of Philip W. Carson, the complainant's son, who regarded Troy as an expert of pr~ ~tical experience on whose judgment the glass company could saiely rely. Now Carson, who was a director of the company continuously from its organization until the stockholders' meeting of September 24, 1906, when he failed of re-election, was and had been attorney in fact of the complainant fully authorized and empowered to act for her in all matters pertaining to the glass company, and all his acts as her representative have been fully approved and ratified by her. Personally she took

no part in the affairs of the company. His approval of Troy as a competent expert on value was her approval. Indeed, an examination of the evidence cannot fail to produce a conviction that Carson, while a stockholder to a small amount, is virtually though not technically the party complaining in this suit in the name of his mother. Ralph E. Burdick also, who was and for years had been a stockholder and director of the glass company, and was at the time a member of its gas committee, investigated for and on behalf of that company the value of the property embraced in Hilton's offer. He testified to the effect that he had "been through the matter quite thoroughly"; that he was wholly uninfluenced in reaching his conclusion by Troy's opinion; and that he was satisfied the offer would be "a profitable thing" for the company. No combination or conspiracy between Hilton, Troy and Burdick to defraud or injure the glass company by placing false values upon the property included in Hilton's offer has been either alleged or proved. In addition to the above circumstances it appears from the minutes of the glass company and corroborative evidence that a special meeting of the directors was held March 15, 1906, at which were present, including Carson, seven of the eight active members of the board, the ninth member being the statutory Delaware director, and that Hilton's offer "was favorably considered but final action deferred till the Citizens Gas Co. had been interviewed and prospects for a new lease ascertained." And it further appears from the minutes and corroborative evidence that at the meeting of the board June 2, 1906, six directors including Carson and Burdick were present, and that on motion of the latter Hilton's offer was accepted. The minutes do not show that Carson made any protest against or objection to that offer or its acceptance at any meeting of the directors prior to September 24, 1906, when the annual stockholders' meeting was held, and according to a clear preponderance of the evidence no such protest or objection was made by him prior to the last named day, if, indeed, any was made on that day, there being entire or substantial unanimity among the directors on this subject. It appears from the minutes that at the annual stockholders' meeting above mentioned all the minority stockholders present in person or by proxy aside from the Carsons voted to approve the acceptance by the board of directors of Hilton's offer. It is difficult, if not impossible, to reconcile the foregoing facts and circumstances with the charge in the bill that Hilton "in fraudulent disregard of the interests of the minority stockholders" of the glass company and without "consultation with its board of directors" negotiated the contract of purchase "at an exorbitant consideration or price," or that Hilton "improperly and unduly influenced a majority of the said stockholders to vote in approval and ratification of the said purchase" or that the acceptance of Hilton's offer constituted a "profligate contract of purchase." There is a presumption of honesty and fair dealing in the business transactions of mankind, and fraud, to be established, must be strictly proved. It cannot be supposed that the directors of the glass company and a large majority of its minority stockholders, other than the Carsons, combined to sacrifice their own pecuniary in-

terests for the sake of benefiting Hilton. The evidence does not show that he bribed them to cheat themselves or that he made any false representations of fact by which they were deceived. They had the opportunity and either directly or indirectly the means of forming an intelligent judgment as to the value to the company of Hilton's offer. They used such opportunity and means and were satisfied with the bargain. While among others there was considerable variance of opinion on the question of value, they without any fraud or undue influence on the part of Hilton deemed the offer reasonable under the circumstances and that its acceptance would be advantageous to the company. This court is unable to find from the evidence taken as a whole that they erred in their judgment; and, unless there be something else in the case requiring the setting aside of the contract, full effect must be given to the acceptance by the board of Hilton's offer and its approval by the stockholders.

The bill charges in substance that Hilton prior to the making and acceptance of his offer fraudulently prevented the glass company from obtaining the requisite amount of gas for the operation of its plant from sources other than the Ormsby company, with the wrongful intention of compelling the glass company to resort to the Ormsby company for its supply of gas upon such terms as the latter company should dictate; and it is contended on the part of the complainant that to secure such result the negotiations theretofore conducted by Hilton for a proper supply of gas "were not in good faith," but "were conducted in a dishonest and dilatory way with the design to preclude the defendant corporation from obtaining a supply by contract with accessible natural gas companies." Careful examination of the evidence has failed to satisfy me that these charges of fraud are justified. Mere suspicion or surmise cannot establish fraud. The evidence falls far short of the necessary measure of proof. The terms and conditions of the contracts under which the glass company had been obtaining gas and the evidence of the terms and conditions on which that company could thereafter obtain the requisite supply, and of delays caused in negotiations for gas by persons other than Hilton, serve, not to support, but rather to negative the charges made against him in this connection. If he with deliberate and fraudulent intent and in utter disregard of the interests of minority stockholders had prevented the gas company from obtaining its supply from sources other than the Ormsby company, it is somewhat remarkable that, having the former company at his mercy through his ownership of stock according to the contention of the complainant, he should not have insisted upon a much less moderate price than that contained in his offer of February 24, 1906. And even if it be assumed for the sake of the argument that Hilton pursued an improper or indeed fraudulent course in order to pave the way for the making and acceptance of his offer of February 24, 1906, it would not follow that the action of the glass company in accepting that offer should be set aside at the instance of one or more minority stockholders, if the offer was not in itself unreasonable, but advantageous to the company, or if the setting aside of the transaction would be disastrous to the company or involve net loss and damage to it in its business and property.

The manner in which the contract of purchase was carried into execution has met severe animadversion on the part of the complainant. Hilton's offer called for the payment by the glass company of $3,000 in cash and of $20,000 in notes with collateral, and of the further sum of $2,000 at a future time from gas obtained from the Tretton leasehold at a certain rate per 1,000 cubic feet, aggregating $25,000, the value placed upon that leasehold. The sum of $15,000, being the residue of the purchase price, was to be paid for by gas obtained from the residue of the property at a certain rate per 1,000 cubic feet. In his offer Hilton said "practically all that the company will have to pay me is $23,000 unless produced out of property." The glass company after acquiring the gas leaseholds would, of course, be at the expense of producing and conveying gas therefrom; and whether this would entail much or little expense necessarily entered as a factor into the valuation of the leaseholds before their acceptance by that company. The cash payment of $3,000 was properly effected in the manner hereinbefore stated. The carrying of the contract of purchase into execution in other respects required some circumspection and ingenuity. The glass company as a foreign corporation was without authority to exercise the right of eminent domain and thus might be subject to serious embarrassment in the conveyance of gas to points not within the territoral limits of the leaseholds. There was some question whether that company could hold, free from liability to escheat, the leaseholds included in Hilton's offer. The ability of the Ormsby company both to hold such leaseholds free from such liability and to exercise the right of eminent domain was beyond question. And Hilton owned practically all the capital stock of the Ormsby company and could control its disposition. Further, the glass company, although a foreign corporation, had a right to acquire and hold the stock of the Ormsby company. These circumstances on being duly weighed suggested the course which was pursued. Hilton transferred to the Ormsby company the leaseholds and secured the transfer of all the capital stock of that company to trustees to hold for the benefit of the glass company or its stockholders. And the Ormsby company gave its promissory note for $20,000 to the glass company which endorsed and delivered the same to Hilton for his own benefit. The Ormsby company also executed and delivered to Hilton as collateral security for the payment of the above note its bond together with its mortgage covering the leaseholds included in his offer. The promissory note, bond and mortgage were transferred by Hilton to the Hamlin Bank & Trust Company of Smethport, Pennsylvania, on account of his individual dealings with and indebtedness to that bank, and the note or a renewal of it and the bond and mortgage have ever since been held by the bank, the amount originally secured thereby having been much reduced. It appears that through the instrumentality of Hilton a gas and oil leasehold which the glass company had obtained from Welthia A. Taylor and Charles Taylor was assigned to the Ormsby company and included among the leaseholds covered by the above mentioned mortgage, and this circumstance is treated by the complainant as an evidence of fraud or wrong doing on the part of

Hilton. The court is unable to take this view of the matter, for the reason that under the offer made by Hilton and accepted by the glass company, the latter was to incur an absolute obligation to pay the specified sum of $20,000, and no reason is perceived why a mortgage given as collateral security for its payment should not include the Taylor leasehold or any other property owned by the glass company. There can be no foundation for an assumption that the mortgage security must have been restricted to the property mentioned in Hilton's offer. All of the capital stock of the Ormsby company having been transferred to trustees for the benefit of the glass company, the latter company was virtually though not technically, indirectly but not directly, the owner of the business and property of the former. There is an expression of doubt or distrust on the part of the complainant as to the bona fides of the arrangement under which the trustees are holding the stock of the Ormsby company; but there is nothing to justify a finding of mala fides in that arrangement. Three certificates, each for 200 shares of the capital stock of that company of the par value of $50 each, amounting in the aggregate to $30,000, the total capital, were issued to Hilton, Burdick and another director of the glass company, who made an express declaration in writing to it to the effect that such capital stock had been so issued to them as trustees for it, and delivered the certificates to its secretary. There is no evidence that the trust thus assumed has been in any manner repudiated or abused. Deducting from the purchase price of $40,000 the cash payment of $3,000 and the $20,000 represented by the promissory note and secured by bond and mortgage as collateral as above mentioned, the remaining $17,000 which under Hilton's offer was to be paid from gas proceeds as therein provided, remained a charge upon such proceeds notwithstanding the transfer of the gas producing leaseholds to the Ormsby company. I do not perceive anything fraudulent, wrongful or oppressive in this arrangement effected for the purpose of carrying into execution the contract of purchase arising from Hilton's offer of February 24, 1906, and its acceptance by the glass company. That company has never through its board of directors or in stockholders' meeting either repudiated or condemned it. The glass company is not here complaining. It is a defendant.

[7] Even if it be assumed that Hilton was guilty of fraud of such character and extent as to warrant the setting aside of the contract of purchase on a proper bill brought by the glass company, it by no means follows that it should be set aside on the application of a minority stockholder. In Corbus v. Gold Mining Co., 187 U. S. 455, 463, 23 Sup. Ct. 157, 160, 47 L. Ed. 256, the court said:

"The directors represent all the stockholders and are presumed to act honestly and according to their best judgment for the interests of all. Their judgment as to any matter lawfully confided to their discretion may not lightly be challenged by any stockholder or at his instance submitted for review to a court of equity. The directors may sometimes properly waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right. They may regard the expense of enforcing the right or the furtherance of the general business of the corporation in determining whether to waive or insist upon the right. And a court of equity may not be called upon at the appeal of any single

stockholder to compel the directors or the corporation to enforce every right which it may possess, irrespective of other considerations. It is not a trifling thing for a stockholder to attempt to coerce the directors of a corporation to an act which their judgment does not approve, or to substitute his judgment for theirs. As said in Dodge v. Woolsey, 18 How. 344: 'The circumstances of each case must determine the jurisdiction of a court of equity to give the relief sought.' "

The ownership of only a minority of the minority of stockholders is behind the objection taken in the bill to the contract. The other minority stockholders are entitled to receive from this court consideration equal to that which should be accorded to the complainant. If the setting aside of the contract would on the whole be more detrimental than advantageous to innocent stockholders the court should not interfere. And much less should it interfere if the result would involve or threaten grave disaster to the business of the company. That such would be the result of interference by this court as prayed in the bill there can be little or no doubt.

The defendants in addition to their defense on the merits rely on certain points among which are the nonjoinder of the Hamlin Bank & Trust Company and the Ormsby company as parties defendant; alleged laches on the part of the complainant in bringing suit; and the omission by the complainant either personally or by Carson, her attorney in fact, to make formal request of the board of directors of the glass company to cause suit to be brought in its name for the purpose of setting aside the contract of purchase. I am strongly inclined to think that the Hamlin Bank & Trust Company as the holder of the bond and mortgage given by the Ormsby company in carrying into execution the contract sought to be set aside, is, so far as that purpose is concerned, not only a necessary but an indispensable party and that the defect can be taken advantage of at the hearing or by the court at any time of its own motion. [8] If the joinder of an indispensable party will oust the jurisdiction of a federal court the party seeking relief must be content to proceed in a state tribunal. But it is not necessary to rely on this or any other of the points last above mentioned, as for the reasons already stated at length the complainant is not entitled to the relief she prays. The bill must be dismissed with costs.