L. V. RUMERY, Appellee, v. STANDARD SEED TESTER COMPANY et al., Appellants.

CORPORATIONS: Subscription to Stock—Cancellation for Fraud. The cancellation of a stock subscription and a judgment for the return of the money paid are amply justified by testimony tending to show the issuance by the corporation of a materially misleading ''prospectus,'' the receipt of plaintiff's money, the wrongful application by the corporation of said money, without acknowledging its receipt, and the failure to issue any stock to plaintiff until after he had rescinded.

*Appeal from Winneshiek District Court.*—H. E. TAYLOR, Judge.

SEPTEMBER 19, 1922.

SUIT in equity by a stockholder, plaintiff, against the corporation and its president, to cancel plaintiff's stock and to

award to plaintiff the purchase price thereof, with interest. The suit is predicated upon fraudulent representations in the sale of said stock to the plaintiff. The defense was, in substance, a general denial. The trial court awarded decree to the plaintiff, as prayed, and as against both defendants. The defendants have appealed.—*Affirmed.*

*Willett & Nelson* and *C. N. Houck,* for appellants.

*E. W. Cutting,* for appellee.

EVANS, J.—The defendant is a corporation purporting to have been incorporated under the laws of Arizona. Its principal promoters were the defendant W. C. Adams, and B. H. Adams, president and secretary, respectively. They were residents of Decorah, and this was the principal place of business of the corporation. Its authorized capital was $500,000. It began to do business in 1911, in the manufacture and sale of a certain device for seed·testing, and continued such business down to and including the year 1914. Within the year 1914, the certain factory which had been employed by it to make its product went into insolvency. Since that time, the corporation has transacted virtually none of the business for which it was organized. Its working capital was very slight. It had sold a few thousand dollars worth of stock in its early career, but the most of this was paid for by promissory notes, most of which were never paid. A comparatively small amount of additional stock was sold in 1915 and 1916. The plaintiff, a resident of Oregon, Illinois, purchased his stock on December 1, 1916. The plaintiff's attention was attracted to the enterprise by receiving the "prospectus" of the corporation, which had been sent to him by mail. The "prospectus" was a somewhat glowing account of the history of the company and its going business and resources. Under the stimulus thereof, the plaintiff went to Decorah, and spent two days in company with the president of the corporation, in obtaining more detailed information along the line of the "prospectus." The result of his conference with the president was that he subscribed for $2,000 worth of stock. Many of the statements of the "prospectus" were, in many material respects, untrue, and their falsity is relied upon by the

plaintiff in support of his action. For the defendants, it is
contended that the real facts were fully disclosed to the plaintiff
by the president, Adams, and, in effect, that all the misstate-
ments or errors contained in the "prospectus" were orally cor-
rected by full disclosures on the part of the president. The is-
sue of fact between the parties is concentrated at this point.
Needless to say that the evidence is in direct conflict. The case
presented is wholly a fact case, upon conflicting evidence. No
disputed legal propositions are involved. The record is a very
voluminous one. In view of our agreement with the decree of
the trial court, we do not deem it necessary to enter into a de-
tailed discussion of the facts. It would indeed be difficult, upon
this record, to include such a discussion within the appropriate
limits of an opinion. We shall content ourselves, therefore, with
two or three general suggestions upon the state of the record.
If the statements of the "prospectus" had been substantially
or approximately true, the investment offered would have been
an alluring one to a prudent investor. Under the actual facts,
as disclosed by the president of the corporation as a witness,
the proposed investment would have been a very forbidding one
to an investor of very ordinary prudence. And this is so, even
assuming that there was no intentional fraud on the part of the
president in accomplishing the sale. In the consideration of
the conflict of evidence between the parties, this fact is influ-
ential, as corroborative of the plaintiff's version. The fact that
the "prospectus" was issued and mailed is itself corroborative
of the plaintiff's version as to what occurred in the conference
between him and the president. Taking the facts as now dis-
closed in the testimony of the president, there was no excuse for
the issuing of the "prospectus" in the form of statement adopted
therein. Assuming it to be the purpose of the promoters to lay
before every purchaser frankly the actual facts, they imposed
upon themselves a needless labor of explanation by issuing a
"prospectus" which needed so much contradiction. There is
another circumstance of considerable significance as bearing
upon the technical right of plaintiff to maintain this action.

Theoretically and professedly, the stock in question was
sold to the plaintiff for development purposes. The working
instrumentalities of the company were to be increased. The

plaintiff gave his note for the stock on December 1, 1916, and paid it on January 3d following. No acknowledgment was made to him of the receipt of the money. No stock was issued to him. No attention was paid to his letters of inquiry. In August following, he put the matter in the hands of his counsel, and through his counsel demanded the return of his money. Up to that time, no stock had been issued to him, and none was, in fact, issued to him until about the 15th of November, 1917. This was sent to him by mail. This is the stock which he seeks to cancel. In the meantime, no effort had been made to use his money for development purposes. On the contrary, it was used, on the day following its receipt, in the payment of prior debts of the company. If it can be said that the company was solvent at all at this time, it was so only in a potential sense, and on the assumption that it was a going concern, with a good prospective business, which, to some extent, reflected its value into the present. It was not a going concern, and had not been such since 1914. It has never since become a going concern. The conduct of the officers of the corporation in their first failure to acknowledge receipt of plaintiff's money and to answer his letters of inquiry, and their neglect or refusal to issue his stock for many months, constituted, in itself, a breach of the contract of sale, and entitled the plaintiff to rescind the same, and to demand the return of his money. Manifestly, if the plaintiff had begun his action in August, when he made his demand, he would have been entitled to the return of his money. In the face of his demand for the return of his money, the defendants sent the stock. This action on their part did not terminate the right of the plaintiff to continue his demand. His action was brought in January following.

Neither the corporation nor its president had any right to make use of plaintiff's money, while withholding from him the issue of his stock. The use which they did make thereof was a wrongful appropriation, which of itself would sustain an action by the plaintiff to recover the same. In the wrongful appropriation the corporation acted through its president, the defendant Adams. He was, therefore, personally liable, equally with the corporation itself.

There is another circumstance appearing in the record

which cannot be wholly ignored in the consideration of the evidence as a whole, and especially in the inferences to be drawn therefrom. The defendant corporation was sister to another corporation, The Adams Seed Company. The defendant corporation lived in the home of the Adams Seed Company. It had no other habitation or headquarters. The same persons, in reverse order, constituted the president and secretary of each corporation. They bought and sold, from, to, and for each other, various lines of merchandise. They borrowed money from each other. Notwithstanding that the defendant corporation was at all times greatly hampered by a lack of working capital; that it had no capital except the proceeds of stock sold; that its working balance was so limited in amount that its current debts were unpaid, yet it had loaned to its sister corporation several thousand dollars of the few proceeds which it had, and this loan was outstanding at the very time that it used the money of the plaintiff to pay its debts.

Nothing specific is predicated upon this fact, other than that it is one of the circumstances of the case, and necessarily tends to give color and significance to the facts of the transaction as a whole. Interlocking management of different corporations is not necessarily illegal, but it is often, if not usually, a warning sign and a challenge to inquiry. If it be a mere method whereby one person or group under different corporate names may contract with himself as both vendor and purchaser, lender and borrower, and whereby the funds of trusting stockholders pay the price of such transactions, it is inherently repugnant to every conception of equity. Such transactions tend to a confusion of manipulation of assets, against which the minority stockholder ordinarily has no adequate protection.

This is a sufficient indication of the more salient features of the case. Without pursuing them into their details, it is sufficient to say that the decree of the district court is fairly sustained by the record before us. It is, accordingly,—*Affirmed.*

STEVENS, C. J., ARTHUR and FAVILLE, JJ., concur.