CLARA BROMSCHWIG and CLARA BROMSCHWIG, Trustee for JOSEPH REMMERS, v. CARTHAGE MARBLE & WHITE LIME COMPANY, a Corporation, GEORGE S. BEIMDIEK, EMIL BEIMDIEK and ARTHUR O. BEIMDIEK, Appellants.—66 S. W. (2d) 889.

Division Two, December 20, 1933.

*Bryan, Williams, Cave & McPheeters* and *Howard Gray* for appellants.

*Marion C. Early* and *Ivon Lodge* for respondents.

TIPTON, J.—This is a suit in equity brought by Clara Bromschwig, in her own right and as trustee for Joseph Remmers, respondents, against the Carthage Marble & White Lime Company, a Corporation; George S. Beimdiek, Emil J. Beimdiek and Arthur O. Beimdiek, appellants.

Hereafter, George S. Beimdiek will be referred to as the appellant; Clara Bromschwig, both in her individual capacity and in her capacity as trustee, will be referred to as respondent; and the Carthage Marble & White Lime Company will be referred to as the company.

Respondent in her petition complains that on several occasions she demanded of the company and the appellant, its president, a financial statement of the company's affairs, but they refused to give her such statement. She also charges that the appellant in September, 1922, purchased what is referred to as the Brannon Avenue property in St. Louis and paid for the same with company funds, and that he wrongfully took the deed in his own name. She further charges that in 1927 the company sold its quarry and operating properties and received a large sum therefor; that the proceeds thereof were invested in *ultra vires* investments; that since that time the appellant had only devoted a trivial amount of his time to the company but was drawing a large salary. She further pleads that in 1922 the appellant used the funds of the company to purchase shares of the com-

pany; that he did purchase all of the outstanding shares except the shares held by the respondent and had the stock issued to himself and members of his family.

Most of the principal facts upon which the respondent bases her cause of action are admitted in the answer of the appellant. The facts briefly are as follows. The company was organized in the year 1884 with a capital stock of $25,000 divided into 250 shares. It conducted a prosperous business in Jasper County, Missouri. In the year 1913 the appellant, who resided in Carthage, Missouri, was made general manager; the stockholders and directors lived in the city of St. Louis. In 1917 the company owed the United States Bank of St. Louis a note for $36,000, which they were unable to pay when due and the same was taken up by Mr. Riddle, then president of the company, and a mortgage was placed upon the assets of the company to secure this loan. This note was paid off in the year 1921. In 1917 or 1918 one of the directors by the name of Remmers died. One share of stock was then issued to the appellant, qualifying him as a director. In the year 1922 the appellant was made general manager of the company, an officer and a director therein, had charge of the books and records, was custodian of its assets and possessed an intimate knowledge of its business. The appellant testified that in the latter part of the year 1921 it was suggested by Mr. Riddle and other directors that he purchase their stock, which he did, paying $100 per share for 220 shares. He was unable to purchase any of the stock owned by the Remmers' estate due to the fact that it was at that time in litigation. It appears from the evidence that he purchased the stock under the following terms: twenty-five per cent cash together with his personal notes payable in four installments, the installments becoming due in April, July and October of 1922, and in January, 1923. These notes, given for the purchase price of the stock, were secured by deposits of the stock as collateral. He obtained the money to pay for the stock by taking it out of the treasury of the company, charging himself with this money on the books of the company, and making the payments on the notes held by the former stockholders from money obtained from the company. At the time of the purchase of the stock the books showed that the company was indebted to him in the sum of $596. Later the appellant bought all the shares of the Remmers' heirs with the exception of those owned by the respondent, which totaled 10 5/7 shares. The appellant had one share of stock issued to his brother Arthur, and another share issued to his brother Emil. Thirty odd shares of stock were issued to his wife. Shortly after the purchase of this stock he caused the by-laws to be changed so that the board of directors was composed of three members instead of four, and his wife and brother Emil were made the direc-

tors. His wife died prior to the filing of this suit and his other brother was elected a director in her place. In the year 1922 the books of the company showed that the appellant took credit for $17,500 on account of real estate transactions, but no real estate was ever deeded to the company, and in the latter part of that year this credit was canceled and a special account was opened on the books showing his indebtedness to the company for this sum.

In the year 1922 the appellant took $5,000 of the company's money and purchased a piece of property in St. Louis known as the Brannon Avenue property which could be used for the St. Louis sales office. He testified that this property was bought for the reason that the property used for the sales office in St. Louis was costing too much rent and that by buying this property he was able to reduce the rent $300 per year and to save paying the taxes on the leased property. He was the grantee in this deed and in 1929 he executed a deed conveying this property to his brother Emil, but in his answer he admitted that he held the property in trust for the company; that this property was reflected upon the books of the company; and that the rent received for this property went to the company.

In the year 1927, he negotiated a sale of the quarries in Jasper County to the Carthage Marble Corporation for the sum of $175,000. The company kept the book accounts, continued to maintain the business in St. Louis and was not restricted from again going into the quarry business. The company invested the proceeds of the sale in bonds of various types which were held in the First National Bank of Carthage, Missouri, or in the First National Bank in Kansas City, Missouri. The appellant testified that it was the intention of the company, if the opportunity arose, to go again into the quarry business. In 1927 and 1928 the company declared three one hundred per cent dividends.

The books of the company show that in 1922 the appellant was charged on a special account with the advancement of $17,500 and an advancement of $5,000 made upon his current account. He paid this special account as follows: on December 31, 1923, he paid $2,000; on December 31 of the following year, he made a payment of $5,500 on this account, and on March 23, 1927, he paid $10,000 balance in the special account. The current account remained a running account down to the date of the trial. In December, 1927, there was still a debit balance against the appellant in the sum of $216.60, but at the close of the business year on December 31, 1928, the last balance before this suit was filed, there was a credit of $873.63. He did not charge himself with any interest on the money obtained from the company. Nor was there any authority shown giving him the right to the use of this money to purchase the stock.

There was evidence to the effect that the appellant at the time he purchased the stock was worth between $6,000 and $15,000. A banker in Carthage testified that he had been approached in regard to making a loan to the appellant for the purchase of the stock and further testified that if he had made the application for the loan, his bank would have loaned appellant $20,000, the maximum loan that it could make, provided that the appellant would put up the stock as collateral. Another banker testified that his bank would have loaned the appellant the same amount under the same conditions.

The trial court found the issues in favor of the respondent, ordered a receiver appointed and ordered an accounting of the appellant to the company. It is from this decree that the appellant has appealed to this court. Other pertinent facts will be stated in the course of this opinion.

■ The duty that an officer or director owes to a corporation is well stated in the case of Barker v. Montana Gold, Silver, Platinum and Tellurium Mining Co., 35 Mont. 351, 89 Pac. 66, 1. c. 70, wherein the Supreme Court of Montana said:

"In equity, the directors of a corporation occupy a fiduciary relation to the corporation and its stockholders. Since they occupy this relation, they may not profit by virtue thereof at the expense of the corporation or the rights of the stockholders. They are required to exercise the utmost good faith in the discharge of the duties arising out of their trust, and to act for the corporation and its stockholders, giving all the benefit of their best judgment. If by dealing with the property of the corporation or its business for their own purposes, directly or indirectly, they derive a personal profit from it, they may be held trustees *ex maleficio,* as to such profits, for the benefit of the corporation and those stockholders who have suffered injury or deprivation by their conduct, and be compelled to restore what they have thus converted to their own use. [Gerry v. Bismarck Bank, 19 Mont. 191, 47 Pac. 810; Coombs et al. v. Barker et al., 31 Mont. 526, 79 Pac. 1; McConnell v. Combination M. & M. Co., 30 Mont. 239, 76 Pac. 194, 104 Am. St. Rep. 703; Id., 31 Mont. 563, 79 Pac. 248.] And under the most favorable view of the authorities, where it appears that the directors have obtained any profit from dealing with the corporation, and the transaction is drawn in question as between them and the stockholders of the corporation, the burden is upon the directors to show that such transaction has been fair, open, and in the utmost good faith. [Coombs v. Barker et al., supra.]" This principle of law is admitted by appellant in his brief.

■ In the case at bar, the appellant was the general manager and director. He had charge of the books and records of the company, was custodian of its assets and possessed an intimate knowl-

edge of its business; in fact, he had complete charge of the business of the company. The business of the company was conducted in Jasper County, where he lived, while the rest of the directors and stockholders lived in St. Louis, Missouri.

In 1922, when he took the money out of the treasury of the company to buy all of the stock except what was held by the respondent, he did so without the authority of the company. He did so without the knowledge of the directors or stockholders of the company. The fact that he charged himself on the books of the company did not keep this transaction from being unlawful. [People's Bank v. Mobile Towing & Wrecking Co., 210 Ala. 678.] Appellant in his reply brief admits that this transaction was unlawful, for he there says:

"And so we say here that the defendant, George Beimdiek, should not have borrowed funds from the corporation; at least, should not have borrowed such funds without giving security therefor. To that extent he was a wrongdoer, yet no one suffered from his wrongdoing. Every dollar of the money borrowed by him was paid back long before this suit was brought. Neither the corporation nor the plaintiff, as stockholder, ever suffered a penny's damage by any acts of George Beimdiek (except, as stated in our original brief, the loss of interest for which he may be charged)."

Assuming that neither the company nor any stockholder suffered damage by the appellant's wrongful transaction in using the company's funds to purchase the stock, we do not believe that in equity this should be any excuse for his unlawful conduct. We think it is immaterial whether or not the company or stockholder has been damaged.

In the case of Bent v. Priest, 10 Mo. App. 543, 1. c. 558, THOMPSON, J., speaking for the St. Louis Court of Appeals, said:

"*It is not essential to the liability of the director that the company has suffered a loss from what he has done; it is sufficient that he has gained a profit through it.* Whether the contract which he has made, or in the making or ratification of which he has concurred, was in point of fact beneficial or injurious to the company, is wholly an immaterial inquiry. The broad principle is, that whatever he acquires by virtue of his fiduciary relation, except in open dealings with the company, such as a director in common with strangers may sometimes have, belongs not to him, but to the company. Nothing else than this satisfies the demands of the law." (Italics ours.)

In the case of Western States Life Ins. Co. v. Lockwood, 166 Cal. 185, 1. c. 195, the Supreme Court of California said:

"The corporation is entitled, of course, to recover secret profits obtained by a director or promoter by a violation of the obligations resting on him. *It is entirely immaterial that the corporation may*

*not have been damaged by the transaction in which they were made.*
[See Bird, etc., Co. v. Hume, 157 Pa. St. 278, 37 Am. St. Rep. 727,
27 Atl. 750.] Such secret profits belong, in view of the principles we
have stated, to the corporation, for the benefit of its stockholders.
[See, also, Farmers & Merchants Bank v. Downey, 53 Cal. 466, 31
Am. Rep. 62; Chandler v. Bacon, 30 Fed. 538; Paducah, etc., Co. v.
Hays (Ky.), 24 S. W. 237; Eden v. Rigsdales Co., 23 L. R. Queen's
Bench Div. 368; Cook on Corporations, sec. 650.]'' (Italics ours.)

''A director or other officer may not either directly or indirectly
derive any personal profit, benefit, or advantage by reason of his posi-
tion that is not enjoyed in common by all the stockholders. He will
not be permitted to retain any secret profits made by him in breach,
or in disregard, of his fiduciary relation but will be required to ac-
count for such profits to the corporation. Neither will the courts
enforce a secret agreement made by him with another person whereby
he is to derive a personal benefit in fraud of the other stockholders.
It is immaterial that the corporation was not damaged by the trans-
action in which the profits were made, or that he acted throughout
in the highest good faith and without intent to injure the corpora-
tion.'' [14A C. J. 122, sec. 1891.]

However, we do not believe that the evidence will justify the
appellant's contention that the company was not damaged by this
transaction. He admits that he paid no interest on the money taken
from the treasury of the company, and that this money was not paid
back for almost five years. In his brief he admits that the company
suffered a ''loss of interest for which he may now be charged.'' After
the sale of the company's quarries in 1927, the board of directors
declared three one hundred per cent dividends, and it is fair to as-
sume that most, if not all, of the money that was used to pay the
appellant's debt to the company was obtained from the company.
Only an accounting will show how much of the money he obtained
from the company to repay this debt. He testified on cross-examina-
tion as follows:

''Q. 1927? And then you paid back all those amounts that had
been charged against you in 1927? A. Yes.

''Q. Or 1922? All of it was paid back? A. Yes.

''Q. That is correct, isn't it? A. Yes, sir.

''Q. And you got that money from the company, too, didn't you?
A. What do you mean?

''Q. The money you paid back—those charges against yourself
that were entered in 1922? A. I got money from other sources also.

''Q. What other sources did you have to earn money except from
this company? A. There are dividends I think you will find—

''Q. (Interrupting) You mean stock dividends? A. —from stock.

"MR. McPHEETERS: (Q.): From whose stock?

"MR. EARLY (Q.): Carthage Marble & White Lime Company, was it? A. Some was that, and some other investments we had, too."

So, we believe that there is substantial evidence that the company was damaged by the taking of the money from the company in 1922. There is no showing what the company was worth in 1922, or in fact at any time. The fact that the company owed a note for $36,000 in 1917, for which the bank demanded payment, does not justify the appellant's assertion that the company at that time was insolvent. Nor does the fact that he was able to sell the company's quarries for $175,000, or seven times the company's capital, in 1927, show that he operated the business in such a way that it made large sums of money by his operation of these quarries. There is no showing when these quarries were purchased.

The appellant in his brief says that:

"The record in this case shows that there was nothing surreptitious or concealed about the advancements that were made to George Beimdiek in connection with the purchase of this stock. Each and every advancement was entered as a charge against him on the books of the corporation and at all times carried on the books of the corporation until the obligations had been paid in full."

He again says in his brief that "there were no directors' minutes authorizing the advancement of this money, but defendants, Emil J. Beimdiek and Arthur O. Beimdiek, both knew that their brother had received this advancement from the company and it was discussed at directors' meetings."

Emil and Arthur Beimdiek were elected to the board of directors after the stock was purchased and we think it was immaterial that they later found out about these advancements. There is no evidence that any director or stockholder, prior to the purchase, knew anything about these advancements. The appellant seeks to uphold this transaction and the burden is upon him to show that it is fair and openly arrived at. [Backus v. Finkelstein, 23 Fed. (2d) 531; Barker v. Montana Gold, Silver, Platinum and Tellurium Mining Co., supra.] We do not believe he has sustained this burden. He did not produce a single stockholder who testified that when he sold his stock he knew that the appellant was using funds of the company to purchase it. It does not seem reasonable that any stockholder would sell his stock for par when there was sufficient money in the treasury of the company in 1922 to pay for stock, leaving the physical assets of the company, if he knew about it.

The respondent inherited her stock in this company from her father who died in 1917 or 1918 and her shares were issued to her in August of 1922. It appears in that year that one of the appellant's

brothers called at respondent's home several times to buy her stock, but she declined to sell until she had seen a financial statement of the condition of the company. There was some correspondence between respondent and appellant after this in which he did not refuse to furnish a statement, but merely stated that it was not yet ready. In fact, he never furnished her with a statement, but only after her husband consulted a lawyer, after he went to Carthage, was he allowed sufficient time to examine the books of the company. We think it can be reasonably inferred from this evidence that he was trying to prevent respondents from learning of these advancements. We agree with the appellant that the failure alone to give the respondent a financial statement would not be ground for the appointment of a receiver. She has an adequate remedy by mandamus to inspect the books. [8 Fletcher on Corporation (2 Ed.), p. 8885; Carson v. Glass Co., 189 Fed. 791.] But we do believe that his promise to respondent that he would give her a statement and his failure to do so is a circumstance tending to show that the transaction in using the company's funds to purchase this stock was a secret one.

In 1922 appellant took credit for $17,500 for a real estate transaction, but as no real estate was ever conveyed to the company, this credit was later canceled. The books then show that he was charged in a special account with this sum. Appellant made no explanation of this transaction, and a fair inference is that this real estate transaction was made for the purpose of keeping the former stockholders from learning that he used the company's funds to purchase the stock. We believe that the evidence justifies the conclusion that this transaction was a secret one. "And loans made to officers of a corporation, effected by themselves and not authorized by the board of directors, call for an accounting." [3 Fletcher Cyclopedia Corporation (2 Ed.), p. 334, sec. 955.]

We have examined the case of Lindemann v. Rusk, 104 N. W. 119, relied upon by appellant but do not believe it in point.

In this transaction the appellant represented both the borrower and the lender and no one else connected with the company knew anything about this transaction. He placed himself in a position that was hostile to the interest of the company. We think it was immaterial, even if he did act in good faith in this transaction. In the case of Western States Life Ins. Co. v. Lockwood, supra, l. c. 193, the Supreme Court of California said:

"In other words, in so far as pecuniary interest was concerned, he secretly placed himself in a position that was hostile to the interests he was bound to protect as an officer of the corporation; in a position where conflict might arise between his trust duty and his personal interest. The rules we have referred to do not allow the president of

a corporation to occupy such a position. For him to do so is a violation or disregard of the obligations incident to the fiduciary or *quasi* trust relation that he occupies. It matters not that the officer is entirely free from any intent to injure the corporation in the slightest degree, acting in fact in the highest good throughout, or that his actions really advantage the corporation. No inquiry may be made into such matter. The inquiry in this regard is stopped when the relation is disclosed. [See Pacific Vinegar, etc., Works v. Smith, 145 Cal. 365, 366, 104 Am. St. Rep. 42, 78 Pac. 550.]''

As to the Brannon Avenue property the appellant admits that he held this property for the benefit of the company. So there is no dispute in regard to the ownership of this property.

The evidence shows that the company holds the proceeds of the sale of the quarries either in the bank at Carthage or Kansas City. This is also admitted by the appellant so that there is no dispute about it.

We think it is immaterial as to who may ultimately be the owner of the shares of the company. All that has been attempted to be done in this proceeding is to bring back to the company assets wrongfully withheld from it by the appellant under the claim of ownership.

We think that the trial court was correct in ordering an accounting and in the appointment of a receiver so that the receiver may make an accounting with the appellant. He should not be required to account to himself. [Hall v. O'Reilly Realty Co., 306 Mo. 182, 267 S. W. 407.]

The judgment of the trial court is, therefore, affirmed. All concur.