**MAYFLOWER HOTEL STOCKHOLDERS PROTECTIVE COMMITTEE et al. v. MAYFLOWER HOTEL CORPORATION et al.**

No. 9714.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 5, 1948.

Decided Jan. 26, 1949.

Leslie C. Garnett, Samuel F. Beach, George Eric Rosden, Jerome J. Dick and John Lewis Smith, Jr., all of Washington, D. C., were on the brief for appellants.

Mr. Edmund L. Jones, of Washington, D.C., with whom Messrs. Nelson T. Hartson and Howard Boyd, both of Washington, D. C., were on the brief for appellees, Mayflower Hotel Corporation, et al. Mr. Roger J. Whiteford, of Washington, D. C., with whom Mr. Philip S. Peyser, of Washington, D. C., was on the brief, for appellees, Hilton Hotels Corporation, et al.

Before EDGERTON, CLARK, and WILBUR K. MILLER, Circuit Judges.

CLARK, Circuit Judge.

This is an appeal from a final judgment of the District Court of the United States for the District of Columbia granting motions to dismiss an amended complaint filed by appellants for injunction, receivership, accounting and to set aside a contract for fraud against the appellees herein.

The appellants brought suit in equity as stockholders of Mayflower Hotel Corporation and on behalf of Mayflower Hotel Stockholders Protective Committee (representing holders of more than 6500 shares of stock of Mayflower Hotel Corporation) and on behalf of many others similarly situated. The appellees are Mayflower Hotel Corporation, Hilton Hotels Corporation, the officers and directors of these two corporations, and Donner Estates, Incorporated. The suit involves sundry charges of fraud involving a conspiracy on the part of the Donner Estates, the former owner of the majority of stock of the Mayflower Hotel Corporation and the Hilton Hotels Corporation, purchaser from Donner of the same majority stock, to unfairly depress the price of the minority stockholders' holdings by fraudulently and untruthfully publishing that the stock had been acquired for a much lesser price than had actually been the case.

The bill charged defendant Folger, formerly president of the Mayflower Corporation, not only with participation in several fraudulent acts as a director, but also with direct fraud in the transaction with regard to the refinancing of certain notes

Mr. D. Worth Clark, of Washington, D. C., with whom Messrs. John Lewis Smith,

which is alleged to have been actually done by arrangements with the bank but which was fraudulently made to appear as a sale to Folger and his brokerage firm, out of which Folger derived a private profit in the sum of $17,000. to the detriment of Mayflower and its stockholders, and the bill alleges that, although the sale was actually to the bank, the records of Mayflower were fraudulently caused to reflect the sale to Folger's firm. The bill further alleges that as soon as Hilton secured the control of the corporation it succeeded, through a controlled Board of Directors in negotiating a management contract between Hilton and Mayflower to the profit of Hilton and greatly to the detriment of Mayflower, and more particularly its minority stockholders who are appellants here.

The trial court sustained a motion to dismiss on the ground that no cause of action was stated. Of course, on motion to dismiss all facts properly pleaded are taken as admitted. We are of the opinion that the trial court erred and that the bill stated not one but several different causes of action, any one of which should have been sufficient to require appellees to answer and to be put upon their proof.

Since the case involves questions of the responsibility of interlocking directorates, the responsibility and liability of the directors in dealing with the corporations of which they are directors, and the duties devolving upon majority stockholders to deal fairly with the corporation and with minority stockholders, it is believed that it would be profitable to set out a few general principles believed to be universally accepted before undertaking analysis of the specific allegations of the complaint.

It is, of course, a fundamental principle that directors of a corporation occupy a fiduciary relationship to the corporation and its stockholders and must act in utmost good faith in managing corporate affairs.[1]

The rule with regard to contracts or dealings between corporations having one or more directors in common has been applied with particular stringency.

In the report of Geddes et al v. Anaconda Copper Mining Co. et al., decided by the Supreme Court of the United States in 1921 and reported in 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425, it is stated that where the minority shareholders of a corporation seek to set aside a sale of its property to another corporation negotiated and made by boards of directors having *a member* in common, the burden is upon those who would maintain the transaction to show the entire fairness and the adequacy of the consideration.

In that case Mr. Justice Clarke delivered the opinion of the Court and, 254 U.S. at page 599, 41 S.Ct. at page 212, 65 L.Ed. 425, he said: "The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588[2]; Thomas

1 Ballantine on Corporations, Par. 114 (1930); 2 L.R.A. 534 (1889); 3 Fletcher Cyclopedia Corporations, Par. 838 (1947 Revision); Ford v. Ford Roofing Co., Mo. App.1926, 285 S.W. 538; Bromschwig v. Carthage Marble Co., 1933, 334 Mo. 319, 66 S.W.2d 889; 35 Mich.L.Rev. 1174 (1937); 1 Morawetz, Private Corporations, 2d ed., Par. 516; Gray v. Cornelius, D.C.1930, 40 F.2d 67; Bonner v. Chopin Nat'l Bank, 1925, 251 Mass. 401, 146 N.E. 666; Spellman, Corporate Directors 14; Bailey v. Jacobs, 1937, 325 Pa. 187, 189 A. 320; Atkins v. Hughes, 1929, 208 Cal. 508, 282 P. 787; Louisiana Mortgage Corp. v. Pickens, La.App.1936, 167 So. 914; Holman v. Moore, 1932, 259 Mich. 63, 242 N.W. 839; Flannery Bolt Co. v. Flannery, D.C.1935, 16 F.Supp. 803; Dodge v. Scripps, 1934, 179 Wash. 308, 37 P.2d 896; Winter v. Anderson, 1934, 242 App.Div. 430, 275 N.Y.S. 373; Johnson v. Crook, 1934, 216 Wis. 534, 257 N. W. 453; and Dixmoor Golf Club v. Evans, 1927, 325 Ill. 612, 156 N.E. 785.

2 23 L.Ed. 328.

v. Brownville, Ft. Kearney & Pacific R. R. Co., 109 U.S. 522;[3] Wardell v. Railroad Co., 103 U.S. 651, 658[4]; Corsicana National Bank v. Johnson, 251 U.S. 68, 90[5]."

In the case of Corsicana National Bank v. Johnson, decided by the Supreme Court of the United States in 1919, reported in 251 U.S. 68, Mr. Justice Pitney delivered the opinion of the Court and on page 90[6] he said:

"The fact that the same persons were directors and managers of both corporations subjects their dealings *inter sese* to close scrutiny. That two corporations have a majority or even the whole membership of their boards of directors in common does not necessarily render transactions between them void; *but transactions resulting from the agency of officers or directors acting at the same time for both must be deemed presumptively fraudulent* unless expressly authorized or ratified by the stockholders; and *certainly where the circumstances show,* as by the undisputed evidence they tended to show in this case, that the transaction would be of great advantage to one corporation at the expense of the other, especially where in addition to this the personal interests of the directors *or any of them* would be enhanced at the expense of the stockholders, the transaction is voidable by the stockholders within a reasonable time after discovery of the fraud. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 589;[7] Wardell v. Railroad Company, 103 U.S. 651, 657, et seq.;[8] Thomas v. Brownville, etc., R. R. Co., 109 U.S. 522, 524;[9] Richardson v. Green, 133 U.S. 30, 43;[10] McGourkey v. Toledo & Ohio Ry. Co., 146 U.S. 536, 552, 565.[11]" (Emphasis added.)

In the earlier case of Twin-Lick Oil Company v. Marbury, 91 U.S. 587, 23 L.Ed. 328, Mr. Justice Miller in delivering the opinion of the Supreme Court said at pages 588, 589:

"That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and *may be set aside on slight grounds,* is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others." (Emphasis ours.)

In the case of McGourkey v. Toledo, etc. Ry. Company, 146 U.S. 536, at page 565,[12] Mr. Justice Brown said:

"No principle of law is better settled than that any arrangement by which directors of a corporation become interested adversely to such corporation in contracts with it, or organize or take stock in companies or associations for the purpose of entering into contracts with the corporation, or become parties to any undertaking to secure to themselves a share in the profits of any transactions to which the corporation is also a party, will be looked upon with suspicion."

Mr. Justice Brown then proceeded to specifically quote with great approval the leading case, Wardell v. Railroad Company, 103 U.S. 651, 26 L.Ed. 509.

This case is of particular interest in deciding the questions now under consideration because it is a case wherein a committee of a Board of Directors of a railroad company entered into a contract with a coal company, the stock of which was largely owned by the Directors of the railroad company for the purchase of coal by the railroad company. *The contract was held to be a fraud upon the railroad company.*

In delivering the opinion of the Court in that case Mr. Justice Field said, 103 U.S. at page 658[13]:

"It is among the rudiments of the law that the same person cannot act for himself and at the same time, with respect to the same matter, as the agent of another whose interests are conflicting. Thus a person cannot be a purchaser of property and at the same time the agent of the ven-

[3] 3 S.Ct. 315, 27 L.Ed. 1018.
[4] 26 L.Ed. 509.
[5] 40 S.Ct. 82, 64 L.Ed. 141.
[6] 40 S.Ct. 82, at page 91.
[7] 23 L.Ed. 328.
[8] 26 L.Ed. 509.
[9] 3 S.Ct. 315, 27 L.Ed. 1018.
[10] 10 S.Ct. 280, 33 L.Ed. 516.
[11] 13 S.Ct. 170, 36 L.Ed. 1079.
[12] 13 S.Ct. at page 180, 36 L.Ed. 1079.
[13] 26 L.Ed. 509.

dor. The two positions impose different obligations, and their union would at once raise a conflict between interest and duty; and, 'constituted as humanity is, in the majority of cases duty would be overborne in the struggle.' Marsh v. Whitmore, 21 Wall. 178, 183.[14] The law, therefore, will always condemn the transactions of a party on his own behalf when, in respect to the matter concerned, he is the agent of others, and will relieve against them whenever their enforcement is seasonably resisted. Directors of corporations, and all persons who stand in a fiduciary relation to other parties, and are clothed with power to act for them, are subject to this rule; they are not permitted to occupy a position which will conflict with the interest of parties they represent and are bound to protect. They cannot, as agents or trustees, enter into or authorize contracts on behalf of those for whom they are appointed to act, and then personally participate in the benefits. Hence all arrangements by directors of a railroad company, to secure an undue advantage to themselves at its expense, by the formation of a new company as an auxiliary to the original one, with an understanding that they, or some of them, shall take stock in it, and then that valuable contracts shall be given to it, in the profits of which they, as stockholders in the new company, are to share, are so many unlawful devices to enrich themselves to the detriment of the stockholders and creditors of the original company, and will be condemned whenever properly brought before the courts for consideration. Great Luxembourg Railway Co. v. Magnay, 25 Beav. 586; Benson v. Heathorn, 1 Y. & Col.C.C. 326; Flint & Pere Marquette Railway Co. v. Dewey, 14 Mich. 477; European & North American Railway Co. v. Poor, 59 Me. 277; Drury v. Cross, 7 Wall. 299." [15]

It may be said that this case has been many times cited, universally followed, and never overruled.

Spellman in his elaborate work on Corporate Directors (1931) states in § 198: "That two corporations have a majority or even the whole membership of their boards of directors in common does not necessarily render transactions between them void, or fraudulent, upon that ground alone.

"In order to understand the decisions applicable to the subject of interlocking directorates it must be recognized at the outset that there are two main types of situations in which the powers of the courts are invoked. First, cases where the fact that two corporations have directors in common may be attributed to coincidence or to the normal consequences flowing from substantial ownership of shares in different corporations in the same field of business by single individuals or groups. Second, situations where membership on the board of directors of one corporation is directly attributable to control of that corporation by another, or by some or all of the stockholders, officers, or directors of another. The decisions of the courts sometimes emphasize the factual differences arising from the presence of these two types of situations, but the legal principles involved are the same for both.

"The danger to be avoided is that a director or group of directors, common to two corporations, may, for reasons of self-interest, favor one of the entities in its dealings with the other. The attitude with which this possibility should be viewed has resulted in a wide divergence of opinion. It has been said, in one instance, for example, that corporations controlled and managed by the same officers, directors, and stockholders have a right to deal with each other, and that the directors are presumed to act honestly and according to their best judgment, for the interest of all, unless fraud is shown. Other cases have urged the proposition that no presumption of unfair action arises from the mere dealing together of corporations with interlocking directorates. An Iowa court has stated that interlocking management of different corporations, while not necessarily illegal, 'should be a warning sign.' Some decisions have gone the whole length and have held that agreements between corporations having substantially identical directors 'must be deemed presumptively fraudulent unless

---

[14] 22 L.Ed. 482.

[15] 19 L.Ed. 40.

expressly authorized or ratified by the stockholders,' and that the presumption may be overcome only by convincing proof that the transaction is fair.

"Whatever may be the attitude with which the courts approach a problem involving interlocking directorates, there is no question but that a situation of this type will be carefully scrutinized, since the directors bear a fiduciary relationship to both sides. The burden of proof rests upon the directors to show the fairness of the transaction by clear and satisfactory evidence." [16]

In a leading Missouri case it was stated in Barrie v. United Railways Co., 1907, 125 Mo.App. 96, 102 S.W. 1078, at pages 1084, 1085:

"For the reason the directory and chief officers of both corporations are practically identical, the presumption is that the tripartite agreement, as between the two corporations, is fraudulent, and hence the assets acquired from the transit company by the United Railways Company, under said agreement, are held by the latter company in trust for the benefit of creditors of the former. But this presumption is not an irrebuttable legal presumption. It is a presumption of fact which may be overcome by clear and convincing proof that the officers and directors acted with impartiality and absolute fairness, so that no advantage was given one corporation over the other in the terms of or in the performance of the contract. Noyes on Intercorporate Relations, § 124, p. 195; Alexander v. Williams, 14 Mo.App. 13; Kitchen v. [St. Louis K. C. & N.] Railway, 69 Mo. 224; Sweeney v. [Grape] Sugar Co., 30 W.Va. 443, 4 S.E. 431, 8 Am.St.Rep. 88." Likewise it is well settled that majority stockholders in a corporation cannot use their voting strength and control of the Board of Directors to deal fraudulently with themselves to the detriment of the corporation and its minority stockholders. 14 Corpus Juris 870 lays down the rule as follows:

"There is no law which makes it impossible for a majority stockholder to enter into a contract with his company. *However, such a contract will be scrutinized with much greater care than if made with a third person,* and where it is unfair or unconscionable a court of equity will interpose at the instance of the corporation or the minority stockholders to prevent it from being used oppressively and in violation of the rights of the minority; * * * Minority stockholders are not precluded from attacking the contract as fraudulent by the fact that it is completely executed, nor, it is held, need they offer to place de-

---

[16] Designations of footnotes throughout the foregoing quotation have been omitted. Citations in those footnotes, without repetition, are as follows: Public Service Comm. v. City of Indianapolis, 1922, 193 Ind. 37, 45, 137 N.E. 705; Smith, Trustee, et al. v. Wells Manufacturing Co. et al., 1897, 148 Ind. 333, 345, 46 N.E. 1000; Internat'l Stevedoring Co. v. Frank Waterhouse & Co., 1924, 129 Wash. 451, 454, 225 P. 420; Polacheck v. Michiwaukee Golf Club, 1929, 198 Wis. 78, 223 N.W. 233; Hellier v. Baush Mach. Tool Co., 1 Cir., 1927, 21 F.2d 705, 707; Marks v. Merrill Paper Mfg. Co., 1913, 203 F. 16, 20; Jesup v. Illinois Cent. R. Co., C.C., 1890, 43 F. 483, 503; Corsicana Nat'l Bank v. Johnson, 1919, 251 U.S. 68, 90, 40 S.Ct. 82, 64 L.Ed. 141; Omar Oil & Gas Co. v. Blair Oil Co., D.C.1922, 285 F. 588, 598–600; Equitable Trust Co. v. Denver & R. G. R. Co., D.C.1920, 269 F. 987, 994, affirmed, sub. nom. Levy v. Equitable Trust Co. of New York, 8 Cir., 1921, 271 F. 49, 56, 28 Yale L.J. 838; Atlantic Refining Co. v. Port Lobos Petroleum Corp., D.C.1922, 280 F. 934, 939; Reclamation Dist. No. 70 v. Birks, 1911, 159 Cal. 233, 237, 113 P. 170, followed in Reclamation Dist. No. 70 v. Blackmer, 1911, 159 Cal. 801, 113 P. 174, decided without opinion; Pennsylvania R. R. Co. v. Minis, 1913, 120 Md. 461, 485, 496, 87 A. 1062, reargument denied, 1913, 120 Md. 512, 88 A. 310; Booth et al. v. Robinson et al., 1880, 55 Md. 419, 441; Rumery v. Standard S. T. Co., 1922, 194 Iowa 325, 189 N.W. 667; Pennsylvania Knitting Mills, Aplnt v. Bayard et al., 1926, 287 Pa. 216, 221, 134 A. 397; Barrie v. United Railways Co., 1907, 125 Mo.App. 96, 120, 102 S.W. 1078; Bentley v. Zelma Oil Co., 1919, 76 Okl. 116, 184 P. 131; Wentz v. Scott, 6 Cir., 1926, 10 F.2d 426, 428; Caldwell v. Dean, 5 Cir., 1926, 10 F.2d 299, 300; Garrett v. Reid-Cashion Land & Cattle Co., 1928, 34 Ariz. 245, 270 P. 1044, 1052; Geddes v. Anaconda Mining Co., 1921, 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425; Irving Bank-Columbia Trust Co. v. Stoddard, 1 Cir., 1923, 292 F. 815, 819.

fendants in statu quo. A corporation which, through stock ownership, controls and conducts the business of another is held to the strictest account and to the observance of the highest rectitude in its transactions with its subsidiary, and has the burden of proving their fairness." (Emphasis added).[17] 18 C.J.S., Corporations, § 490.

To the same effect, Noyes on Intercorporate Relations, 2d Ed. (1909) § 300, specifically calls attention to the rule that corporations owning controlling stock in subsidiary corporations occupy no different position in their duty to the company and its minority stockholders than individuals in the same situation:

"When a majority of the stock of one corporation is owned by another, which thereby acquires the right to control its management, the controlling corporation assumes a relation of trust towards the minority stockholders of the corporation controlled, and is under an obligation to manage its affairs for the benefit of all the stockholders and not for its own aggrandisement.[18] This is merely an application of the principle that, while a majority of the stockholders may legally control the corporation's business, they assume the correlative duty of good faith, and cannot manipulate such business in their own interest to the injury of minority stockholders." [19]

In Farmers' Loan, etc. Co. v. New York, etc. R. Co., 44 N.E. at pages 1048, 1049, Judge Martin said:

"While the question in some of the cases cited arose between stockholders and the directors and officers of a company who, as such, held a position of trust as to the former, still where, as in this case, a majority of the stock is owned by a corporation or a combination of individuals, and it assumes the control of another company's business and affairs through its control of the officers and directors of the corporation, it would seem that, for all practical purposes, it becomes the corporation of which it holds a majority of stock, and assumes the same trust relation towards the minority stockholders that a corporation itself usually bears to its stockholders * * *."

In Pepper v. Litton, 1939, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281, Mr. Justice Douglas said: "The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain."

In 13 Am.Jur., Corporations, § 425, the rule as to protection of minority stockholders against oppression by majority stockholders, is stated as follows: "On complaint of minority stockholders the court will intervene to protect their interests where the majority of the stockholders of a corporation, over the protest of the minority, have dealt with themselves."

And in an Arizona case, Garrett v. Reid-Cashion Land & Cattle Co., 1928, 34 Ariz. 245, 270 P. 1044, 1052, the reason for the rule is stated with admirable clarity: "Transactions by interlocking directorates with trust property afford such great opportunity and temptation for misuse or perversion of power by the trustees that the courts have thought fit to promulgate the

[17] Mumford v. Ecuador Dev. Co., C.C., 111 F. 639; Flint v. Eureka Marble Co., 53 Vt. 669; Rogers v. Nashville, etc., R. Co., 6 Cir., 91 F. 299; Central Trust Co. v. Bridges, 6 Cir., 57 F. 753; Bassett v. Monte Christo Gold, etc. Min. Co., 15 Nev. 293; Russell v. Rock Run, etc., Co., 184 Pa. 102, 39 A. 21; Woodroof v. Howes, 88 Cal. 184, 26 P. 111; Pennsylvania Canal Co. v. Brown, 3 Cir., 235 F. 669.

[18] Farmers' Loan, etc. Co. v. New York, etc. R. Co., 1896, 150 N.Y. 410, 44 N.E. 1043, 34 L.R.A. 76, 55 Am.St.Rep. 689; Barr v. N. Y., etc., Co., 1884, 96 N.Y. 444; George v. Central R., etc. Co., 1893, 101 Ala. 607, 14 So. 752; Davis v. United States Electric P. & L. Co.,

1893, 77 Md. 35, 25 A. 982; Goodin v. Cincinnati, etc. Co., 1868, 18 Ohio St. 169, 98 Am.Dec. 95; Pearson v. Concord R. Corp., 1883, 62 N.H. 537, 13 Am.St.Rep. 590; Glengary Consol. Mining Co. v. Boehmer, 1900, 28 Colo. 1, 62 P. 839.

[19] Ervin v. Oregon R., etc. Co., C.C. 1886, 27 F. 625, 630; Meeker v. Winthrop Iron Co., C.C.1883, 17 F. 48; Jackson v. Ludeling, 1874, 21 Wall 616, 88 U.S. 616, 22 L.Ed. 492; Wright v. Oroville Min. Co., 1870, 40 Cal. 20; Gamble v. Queens County Water Co., 1890, 123 N.Y. 91, 25 N.E. 201, 9 L.R.A. 527; Sage v. Culver, 1895, 147 N.Y. 241, 41 N.E. 513; Pondir v. New York, etc. R. Co., 1893, 72 Hun. 384, 25 N.Y.S. 560.

rule of placing upon them the burden of proof to show 'entire fairness; and, where a sale is involved, the full adequacy of the consideration.' "

■ Mr. Justice Douglas in Pepper v. Litton, admirably sums up the ordinary rule of equity as to corporations that the majority has a right to control, but where it does so it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors. The same fiduciary duty is due from a dominant or controlling stockholder or group of stockholders to the minority as is due from the director of a corporation to the stockholders. Said Mr. Justice Douglas in that case, 308 U.S. at page 306, 60 S.Ct. at page 245, 84 L.Ed. 281: "A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099. Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall. 616, 624, 22 L.Ed. 492."

It is also true that the majority stockholders, upon whom the minority is dependent for knowledge, must make full disclosure when selling stock control. Sautter v. Fulmer, 1932, 258 N.Y. 107, 179 N.E. 310. Fletcher Cyclopedia Corporations, Vol. 13, Sec. 5845, states: "A secret and unfair sale of controlling stock may be redressed by suit of the minority."

■ We will now proceed to apply these established principles of law to the instant case. Inasmuch as this case comes up on an order for dismissal of plaintiffs' amended complaint in the District Court, the facts of the case as they might subsequently develop at a hearing of the cause on its merits are not now before us and we are not concerned with what plaintiffs might or might not be able to prove. All facts properly pleaded are taken as confessed, as we have stated above.

The amended complaint alleges that the Mayflower Hotel was completed in 1925 at a cost of more than $10,000,000, and equipment and furnishings were installed at a cost of $1,500,000. At that time a first deed of trust of $7,500,000 and a second trust of $2,400,000 were placed upon the property, and both preferred and common stock were issued.

In 1934 the Company was reorganized and under the Reorganization Plan of 1934 all the first and second trusts and existing stock issues were cancelled, a new first trust of $4,450,860 was placed on the property and a new stock issue of 445,086 shares of common stock at $1.00 per share was authorized. The defendant, Mayflower Hotel Corporation, was incorporated under the laws of the State of Delaware in the year 1934 for the sole purpose of owning and operating the Mayflower Hotel in the City of Washington.

Complaint further alleges that since its reorganization in 1934, defendant Mayflower has been continuously and successfully operated at a profit and that in 1946, in spite of a 21-day strike of its employees, the income from operations amounted to $5,149,716.50, while the net operating profit, after the payment of all taxes, was $345,653.01. Complaint further alleges that the ratio of gross operating profits to invested capital of Mayflower has been one of the highest among the renowned hotels of this country and plaintiffs further allege, on information and belief, that said ratio of Mayflower is higher than that of the hotels in the chain of defendant Hilton.

It is alleged that as of December 31, 1946, the financial statement of Mayflower shows $3,210,585 undistributed surplus, amounting to over $8.23 per outstanding share.

■ Plaintiffs allege that for many years prior to December 18, 1946, the defendant Donner had been considered the holder of a majority of the stock of Mayflower. That the defendant Donner had voted such stock and had appointed the officers and directors by exercise of such majority although such stock was not registered in the Donner name but in the name of other parties acting for Donner, and that for years Donner had permitted identification of itself as controlling stockholder of Mayflower and permitted a letter to be sent out by Hilton, dated December 18, 1946, designating Donner as such controlling stockholder.

The complaint then alleges specifically that in pursuance of a scheme to depress the market value of the stock of Mayflower, Donner, acting through its Mayflower directors and officers, refused to pay dividends upon said stock. During this period it is alleged that Donner, through its investment counsel, the defendant Folger, who was incidentally the President of Mayflower, and others, continued to purchase Mayflower stock at its reduced market value, and further alleges that the defendant Folger participated in these acts in violation of his fiduciary duties to Mayflower and the minority stockholders.

Here is plainly stated one cause of action against Donner, Hilton and their agents and certainly against the defendant Folger, who is specifically accused of a violation of his fiduciary duties as President and Director to the Mayflower Company and to the minority stockholders.

The complaint goes on to allege upon information and belief that during the year 1945 and thereafter the defendant Donner, the majority stockholder, acting through the defendants Stewart and C. Kenneth Baxter, both of whom were directors in Mayflower, elected by Donner, entered into a conspiracy with the defendants Binns, Folger and Hilton and the latter's officers and directors as follows:

(1) to secure Mayflower for Hilton by illegal means, namely, secretly and fraudulently so as to circumvent the stockholders and to defraud the minority stockholders; and (2) to assist the defendant Hilton in the acquisition of Mayflower stock held by minority stockholders at a manipulated price by knowingly making misrepresentations as to the price paid by Hilton to Donner, with the intent to induce the minority stockholders to sell at such false price, and to assist the defendant Hilton in exercising its control fraudulently by operating Mayflower primarily for Hilton's benefit, as set forth specifically hereinafter.

Here is cause of action stated. While it is admitted on all sides that the majority stockholders had a right to sell to whom they chose, when they chose, and at whatever price they chose to accept, the allegations that in pursuance of a fraudulent conspiracy the price was misrepresented for the purpose of artificially depressing the price of the minority stock, in our view, state another cause of action.

But the petition is more specific as showing the overt acts and breaches of fiduciary duty in pursuance of the alleged fraudulent conspiracy. It is alleged:

(1) On October 22, 1945, defendant Binns, an appointee and representative of the defendant Donner on the Board of Directors of Mayflower, resigned as a director of Mayflower. Soon thereafter he became associated with the defendant Hilton. It is alleged that the purpose of this change was to prepare for and cause the transfer of control secretly, by utilizing the knowledge obtained by the defendant Binns while representing Donner on the Board of Directors of Mayflower; and (2) in July, 1946, in order to prepare for consummation of the conspiracy, the defendant Folger, together with the defendants Stewart and C. Kenneth Baxter, caused the mortgage on Mayflower to be paid off, so as to clear the property for the benefit of the future majority stockholder, Hilton. This transaction was financed by notes in the amount of $1,700,000, and it is alleged that instead of consummating this arrangement with the banks with whom it was made, the brokerage firm in which the defendant Folger is the senior partner was interposed as the buyer of the notes, that the money for the purchase of these notes came from the banks and not from the defendant Folger but that the records of the defendant Mayflower were erroneously caused to reflect a sale to the firm of which the defendant Folger is senior partner, whereas in truth and in fact sale was to the banks. And it is alleged that by this method Folger fraudulently and illegally profited in the sum of $17,000 to the detriment of Mayflower and its stockholders.

Here certainly is a most serious charge of breach of trust and most nefarious conduct on the part of defendant Folger. Bearing in mind that Folger was President and Director of the Mayflower Corporation, as well as senior partner of the brokerage firm, this charge is that he did not deal at arm's length with his own firm

in the transaction, but took a "rake-off" of $17,000 through false entries on the Mayflower books for doing something that he should have done in his capacity as President and Director of the Mayflower Corporation.

It is further alleged that in or about August, 1945, the defendant Folger, as President of the Board of Directors of Mayflower, received an offer for the purchase of the Mayflower Hotel in the amount of $9,000,000, which offer he communicated to his co-conspirators, the defendants Stewart and C. Kenneth Baxter, but that in pursuance of the scheme or conspiracy as set forth hereinbefore and in violation of their fiduciary duties, the defendants Folger, Stewart and C. Kenneth Baxter refused to consider said offer and did not submit it to the Chairman of the Board of Directors, and kept it secret from their co-directors and the stockholders. It is alleged that this offer would have resulted in a prorated realizable value of more than $18 per share in Mayflower.

It is further alleged that on or about August, 1946, the defendant Donner, through the defendants Folger, Stewart and C. Kenneth Baxter, received an offer from responsible buyers of $17½ per share for their stock in Mayflower, which unaccepted offer was concealed from the Board of Directors and the stockholders and was still pending at the time the sale to Hilton at the alleged $13 per share was announced.

Here is plainly another cause of action against the defendants Donner, Folger, Stewart and C. Kenneth Baxter. It is an allegation that the majority stockholders and three key directors wilfully and in pursuance of a conspiracy withheld vitally important information from their associates on the Board of Directors and from the stockholders at large—information of vital importance and information to which they were entitled under every rule of law and equity.

It is further alleged that defendant Folger had been Chairman of a committee appointed by Mayflower to investigate the propriety of having Mayflower join a chain of hotels. This committee reported unanimously that it would not be to the best interest of Mayflower to join such a chain

and that such move would be disastrous to Mayflower, and it is alleged that this report was adopted by Mayflower. It is alleged that, nevertheless, knowing fully of this report and having officially subscribed to the views expressed therein, the defendant Folger, acting in concert with the defendants Stewart and C. Kenneth Baxter, actively participated in the sale from Donner to Hilton and the defendant Folger advised the directors to enter into the management contract with the Hilton chain.

It is further alleged that on December 19, 1946, an emergency meeting of the Board of Directors of the defendant Mayflower was called by telephone without notice by defendant Folger, its President and special representative of the defendant Donner. It is further alleged that at this time the defendants Donner and Folger had sold their stock in Mayflower to Hilton, and that before the meeting the defendant Folger had secured the resignations of the defendants Harold Baxter, McGrath, Stewart and Beale from the Board of Directors. The resignation of Beale was demanded and he did hand in a letter of resignation, he having had no prior knowledge of any of the transactions herein set forth and no intention of resigning.

It might be said at this point that there is nothing in the allegations of the plaintiffs' complaint upon which the defendants Harold Baxter, McGrath, and Beale should be held to answer and that therefore the dismissal as to those defendants by the trial court was entirely proper.

It is further alleged that under the by-laws of Mayflower the resignation of these four members from the Board of Directors, constituting the majority of the Board, would have necessitated elections by the stockholders but it is further alleged that in order to circumvent the rights of the stockholders and to carry out the purposes of the conspiracy without interference or delay, the defendant Folger, although he had the four resignations in his hand, did not present these resignations to the Board together, but in lots of two. This is alleged to be a subterfuge for the circumvention of the rights of the stock-

holders by which four directors of the defendant Hilton, who were waiting and ready to assume control, were elected.

Here is an allegation of a technical violation of the by-laws of Mayflower which, if sustained by proof, would invalidate all the subsequent proceedings of which appellants complain. We think that upon this issue appellees should be required to answer and be put upon their proof.

It is alleged that at the same meeting the defendant Folger resigned as President of Mayflower but was retained and elected as a member of its Executive Committee, and that all of the officers of Mayflower resigned and were replaced by Hilton officials (except the defendant Raney). As a result of this election appellants allege that every officer of the defendant Mayflower, with the exception of Raney, is now an officer of the defendant Hilton and it is further alleged that of the seven directors of the defendant Mayflower a majority are also directors of defendant Hilton. It is alleged that none of the former directors and officers of Mayflower had ever informed the minority stockholders about the transfer of control of Mayflower from Donner to Hilton and that the only information given was by Hilton after the transfer and was incomplete and misleading.

It is alleged that on December 19, 1946, the defendant Folger, as President of Mayflower, and the defendant C. N. Hilton, as President of Hilton announced through the public press, without prior notice to the stockholders, that the defendant Hilton had purchased all the stock controlled by Donner and had taken over control of the Mayflower Hotel, effective as of that date. It is alleged that thereafter, the defendant Hilton asserted ownership of the Mayflower Hotel.

It is further alleged that on December 18, 1946, and mailed on December 20, 1946, on stationery of the Hilton Hotels Corporation, the defendant Hilton, by C. N. Hilton as President, sent a printed circular letter postmarked Washington, D. C., to the stockholders of Mayflower, stating that on that day the defendant Hilton had purchased all the common stock of Mayflower controlled by Donner at the price of $13 per share, and agreeing that "the same offer would be made to all other holders of the Mayflower Hotel Corporation common stock", the stock to be forwarded by mail to the defendant Hilton, Stevens Hotel, Chicago, Illinois.

■ The appellants specifically allege from information and belief that this letter deliberately misrepresented the price paid for the shares, failed to state the whole transaction, and was intended to induce the minority stockholders to surrender their stock at such fictitious price.

Here certainly is another cause of action stated since it is alleged that by conspiracy between Donner and Hilton and certain directors, a deliberately misleading version was put out of an actual transaction not truly representing the actual transaction but deliberately designed to depress through propaganda and misinformation the value of the outstanding minority stock.

■ We now come to the most important of the allegations in appellants' amended complaint, since it involves directly the principles set out in the earlier part of this opinion as to dealings between the interlocking directorates and oppression of subsidiary corporations having minority stockholders by controlling corporations owning a majority of stock of the subsidiary corporation but having no identity with or sympathy for the rights of minority stockholders of the subsidiary corporation.

■ It is alleged that at the emergency meeting on December 19, 1946, after defendant Hilton had taken over control, the Board, the majority of which consisted of Hilton directors, authorized Hilton to draft a management contract and, simultaneously, the active management of Mayflower was turned over to Hilton and was thereafter exercised through Hilton directly, and that this was done pursuant to an arrangement between Donner and Hilton made even before the sale of stock had been consummated and never disclosed to the stockholders.

It is further alleged that the management contract as prepared by the defendant Hilton was formally approved on Jan-

uary 27, 1947. (A copy of this contract is included as an Exhibit to the complaint).

It is alleged, and the Exhibit shows, that this management contract was executed by the defendant Binns, acting as Executive Vice President for the defendant Hilton (Binns was also Vice President of the Mayflower), and by the defendant Ludwig, acting as Treasurer of Mayflower (Ludwig was also Vice President and Treasurer of Hilton).

It is further alleged that immediately upon Hilton's taking control of the operations of Mayflower, the firm of Hogan and Hartson, General Counsel for Mayflower for years, was superseded by the firm of Gottlieb, Schwartz & Friedman, of Chicago, attorneys for Hilton, the said Friedman now being Secretary of both Mayflower and Hilton, and that at the same time the accountants for Mayflower since its incorporation were removed and new accountants were selected by Hilton.

It is further alleged that as a result of the scheme and conspiracy, the defendant Hilton, for supposedly $2,600,000, secured control and management of Mayflower, including its going profitable business and good will, and properties of the value of $12,000,000.

Plaintiffs allege further that the management contract entered into by the interlocking directorate, besides constituting an overt act of conspiracy, is also fraudulent in itself, in that it (1) obligates Mayflower to pay substantial sums, the aggregate of which would have amounted to over $60,-000 for the operating year of 1946, such sums being in payment for the discharge of duties incumbent upon the officers and directors of Mayflower without such contract; (2) superimposes the costs of the management contract upon the costs of the duly constituted management in spite of the fact that such management is and has been efficient to the point of producing a relatively higher income than the comparable Hilton hotels; (3) inures to the benefit of Hilton only, since the alleged benefits to Mayflower are controlled solely by Hilton, as the defendants well knew and know; (4) does not contain any limit on the charges which the defendant Hilton may make to Mayflower for the services of its Plant and Equipment Division, Credit Department, advertising, promotion, and the maintenance of a staff; (5) does not contain any provision for an accounting or check on the part of Mayflower; (6) is made interminable and self-perpetuating for a total period of five years by making notice subject to a partial Arbitration Board, waiving court review and being self-perpetuating from year to year save for the right of notice, which is exercisable only by Hilton executives acting as Mayflower executives; and (7) provides for a "review" of even such notice as is possible, by an arbitration clause under which one arbitrator is to be appointed by Mayflower, completely controlled by Hilton, making such appointee a Hilton appointee, while a second arbitrator is to be appointed directly by Hilton. The two arbitrators (directly and indirectly appointed by Hilton) are to select a third member under the usual provisions.

The complaint then alleges that each of the acts heretofore alleged as in furtherance of the conspiracy is a violation of the fiduciary duties of the defendants and constitutes actionable and continuing fraud upon Mayflower and its stockholders, for which the defendants Hilton, Donner, C. N. Hilton, Stewart, C. Kenneth Baxter and Folger should be held answerable to the corporation and its stockholders.

Without passing on the validity of the evidence which may be adduced to support these allegations we are clearly of the opinion that, as to the defendants mentioned, several causes of action have been stated, and that they should be required to answer and be put upon their proof to sustain their position. We are of the opinion that the management contract, considering all the circumstances, particularly the majority ownership of Hilton, raises a presumption of fraud, rebuttable to be sure, but which requires the appellees to go forward with proof. On its face, it would seem, through the provisions that a very large fee based on the gross receipts of the business would be taken whether the corporation actually made profit or not, that it would be possible for the majority stockholder, that is

to say, the Hilton corporation, to completely milk the corporation by the simple device of paying itself enormous management fees and refusing to pay dividends on common stock of the corporation. As to the other so-called "accommodation directors" no specific allegations are made against them and their cases may well be dismissed.

We therefore reverse and remand with instructions to reinstate the amended complaint and direct that the defendants be required to answer and that the case proceed to trial in accordance with this opinion.